United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 4, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-60080

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CITY OF JACKSON, MISSISSIPPI,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, SMITH, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant City of Jackson, Mississippi (the "City")
appeals the district court's order holding it in civil contempt for
willfully violating a consent decree by denying a special use
permit. As punishment for the City's actions, the district court
ordered it to pay attorney's fees to the Plaintiff-Appellee United
States of America (the "government"), as well as to the entity
aggrieved by the City's denial. Specifically, the City now appeals
the remedy fashioned by the district court. Finding no merit in
any of the City's contentions on appeal, we affirm the district

court's order in all respects.

## I.  FACTS & PROCEEDINGS

As the City acknowledges, the essential facts relevant to this appeal are undisputed.  In 1996, the government sued the City, charging it with violating provisions of the Fair Housing Amendments Act ("FHAA").[1]  The government asserted that the City's zoning ordinances and policies violated the FHAA by failing to make the reasonable accommodations necessary to afford disabled persons equal housing opportunities.  Together, the government and an intervenor that is no longer involved in this litigation succeeded in obtaining summary judgment against the City on the issue of liability.  In 1997, the government and the City entered into a consent decree in lieu of proceeding to trial on the issue of remedies.

The consent decree, in language that tracks the FHAA's anti-discrimination provisions, prohibits the City from engaging in specified discriminatory housing practices.  The consent decree also compelled the City to amend its zoning ordinance to permit group homes for disabled persons in residential districts zoned R-1.[2]  Most important for today's purposes, the consent decree

---

[1] 42 U.S.C. § 3601, et seq. (2000).  In 1988, Congress passed the Fair Housing Amendments Act of 1988, Pub. L. 100-430, 102 Stat. 1619, amending 42 U.S.C. §§ 3601-3619, to extend the Fair Housing Act's ("FHA") promise of equal opportunity in housing to individuals with handicaps and families with children.

[2] The City amended its zoning ordinance to comply with the consent decree.  The amended ordinance provides, inter alia, that

2

contains express remedies for non-compliance:

> Upon any failure by the City, <u>whether willful or otherwise</u>, to perform in a timely manner any act required by this Consent Decree, or in the event of any other material act by the City violating any provision of this Consent Decree, <u>the United States or plaintiff-intervenor may move this Court to impose any remedy authorized by law or equity, including but not limited to an order</u> requiring performance of an act, deeming an act to have been performed or <u>awarding any damages, costs and/or attorneys' fees which may be occasioned by the City's violation of this Consent Decree.</u> Notwithstanding the foregoing, the parties shall endeavor in good faith to resolve informally any difference regarding the interpretation of, or compliance with, this Consent Decree prior to bring[ing] such matters to the Court for resolution. (emphasis added).

In 1998, Christians in Action ("CA"), a Mississippi non-profit organization, applied to the City for a special use permit to relocate its shelter for abandoned and abused children to a residential area in the City zoned R-1. After CA's initial application was denied, it sought reconsideration to present evidence on the children's disabilities. The City directed CA to submit a new application, which CA did in May 2000.[3]

The next month, the City's Planning Board held an evidentiary hearing on CA's request. At that hearing, CA's attorney, James A. Peden, Jr., described the program and the need for the type of housing administered by CA. Mr. Peden also presented

---

group homes which house between 7 and 12 handicapped residents are permitted in R-1 districts if they are established in accordance with the ordinance. The operator of such a group home must obtain a special use permit from the City.

[3] The government does not assert that the City's initial denial of CA's application violated the consent decree.

uncontradicted evidence on behalf of CA demonstrating that the City's grant of the required special use permit would have no adverse effect on the neighborhood or nearby property values. At the hearing, the Deputy City Attorney reminded the Planning Board of the history of the consent decree and of the City's obligations under it, emphasizing that the City could not simply deny the permit for such capricious reasons as, "'We want it,' or 'We don't want it,' or the neighborhoods want it or don't want it." The Deputy City Attorney admonished that such grounds are "not legal criteria." Nevertheless, the Planning Board voted to deny CA's application for the special use permit.

In September 2000, the City Council considered CA's application in light of the record developed before the Planning Board. At this meeting, Mr. Peden reminded the City Council that the record included evidence demonstrating that the CA children were "handicapped" within the meaning of the FHAA. Several homeowners spoke out against granting CA the special use permit, as did some members of the City Council. For example, Councilmember Chip Reno articulated his opposition to granting the special use permit by denouncing the courts' interpretations of the FHAA:

> Mr. Peden did a fantastic job explaining to you what the law was, and we have heard from our attorneys what the law has been in terms of its interpretation by the courts. I think that interpretation is unjust. I will explain why.
>
> According to the interpretation, any residence basically in the City of Jackson R-1, R-1A, can be purchased and application petitioned for special use in order that a

4

> handicapped group home can go into that location. Therefore, Chip Reno next door to his home, someone could purchase that particular home in a neighborhood and petition for that type of use. And I submit that that is wrong. The judicial interpretation of this particular piece of legislation from Congress is absolutely, positively wrong.

Other members of the City Council expressed agreement, and it voted unanimously to deny CA's application. As a result, the government wrote to the City demanding an explanation for its denial. Instead of responding to the government, the City Council voted to reconsider CA's request.

In November 2000, the City Council conducted a second hearing on the matter. The City's attorney and Mr. Peden again reminded the City Council of the City's legal obligations, and again area landowners made their opposition known. At this hearing, Councilmember Leslie McLemore cautioned the City Council against violating the consent decree:

> [T]he thing that I'm reminded of ... is that the consent decree is something that we should not take too lightly. I really don't think that our city ought to be in the business of defying consent decrees. Last week, I noted that the police department, the fire department, these departments are what they are because of consent decrees which we systematically followed and were forced to follow by the court. I'm also reminded that I obtained the right to vote in 1965 because somebody on the federal level said that African Americans should have a right to vote. I'm reminded that the 1964 Civil Rights Act was enacted because somebody on the federal level said that we should have our civil rights. I could go on and on. I think you understand my point.... I know I am where I am because someone prevailed external to Mississippi to make it possible for me to be where I am now, along with the struggle of people that fought and died and bled for the right to vote in this State.

5

Notwithstanding Councilmember McLemore's entreaty, the City Council denied the requested permit by a tie vote. The next month, the City responded to a letter from the government stating simply, "[i]t is the City of Jackson's position that its records and orders speak for themselves. It is the City's position that it acted properly in denying the above referenced petition."

In January 2001, the government filed a motion in the district court to have the City held in contempt for violating the consent decree. Just one week later, the City Council once more voted to reconsider CA's request for a special use permit — this time approving it.

The government filed a motion in the district court for summary judgment on the issue of the City's contempt. After conducting a hearing on the contempt motion, the district court found that the City had willfully violated the consent decree and held the City in contempt. Because the City had already issued a special use permit to CA, however, the court directed the government to file a motion for damages resulting from the contempt proceedings. The government requested attorney's fees at a rate of $125 per hour, as well as expenses for itself and attorney's fees for CA. In November 2001, at the hearing on the government's motion for fees, the City conceded that its denial of CA's special use permit violated both the consent decree and the FHAA. The City, nevertheless, opposed an award of attorney's fees to the government at a rate of $125 per hour and challenged any award of

6

attorney's fees to CA.

In October 2002, the district court issued a comprehensive memorandum opinion and order, awarding the government some $39,000 in expenses and attorney's fees (calculated at a rate of $125 per hour) and ordering the City to pay CA damages of approximately $13,000, the total amount of the expenses, costs, and attorney's fees incurred by CA.

## II.  ANALYSIS

The City called this tune and lost.  In a thinly-veiled attempt to avoid paying the piper, however, the City would now hide behind the American Rule of fee-shifting.  The City —— and those city officials who ignored the sound advice of the City's own attorney and Councilmember McLemore —— have only themselves to blame for the sanctions imposed by the district court. Unfortunately, it is the taxpayers of the City who will have to suffer the consequences of the City's wasteful actions.

A.    STANDARD OF REVIEW

We review contempt orders and sanctions imposed under a court's inherent powers for an abuse of discretion.[4] We review the district court's underlying findings of fact for clear error and

---

[4] Am. Airlines, Inc. v. Allied Pilots Ass'n, 228 F.3d 574, 578 (5th Cir. 2000) (citing Martin v. Trinity Indus., Inc., 959 F.2d 45, 46 (5th Cir. 1992); Crowe v. Smith, 151 F.3d 217, 226 (5th Cir. 1998)).

its underlying conclusions of law <u>de</u> <u>novo</u>.[5]  In reviewing sanctions imposed under the district court's various sanctioning powers, we will not substitute our judgment for that of the district court.[6]

B.    REMEDIES FOR CIVIL CONTEMPT

In a civil contempt proceeding, the movant must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order.[7]  As the City concedes that it violated the consent decree and the FHAA, the government clearly has met its burden for establishing contempt. On appeal, the City acknowledges this much —— as it must.  But the City remains unhappy with the remedy fashioned by the district court as a sanction for the City's conduct.

### 1.    Authority To Award Attorney's Fees to the Government.

The City first advances that the district court had no authority under the FHAA or the law of civil contempt to award attorney's fees to the government.  The City relies on the FHAA's "prevailing party" provision, which expressly exempts the federal government from recovering attorney's fees.  Section 3614 of Title 42, which authorizes the attorney general to commence civil actions

---

[5] <u>Id.</u> (citing <u>Petroleos Mexicanos v. Crawford Enter., Inc.</u>, 826 F.2d 392, 401 (5th Cir. 1987)).

[6] <u>Topalian v. Ehrman</u>, 3 F.3d 931, 935 (5th Cir. 1993).

[7] <u>Am. Airlines</u>, 228 F.3d at 581.

8

to enforce the FHAA, gives district courts the discretion to "allow the prevailing party, <u>other than the United States</u>, a reasonable attorney's fee and costs."[8]  The City's reliance on the FHAA's prevailing party fee-shifting provision rings hollow, to say the least.

The spurious nature of the City's argument becomes self-evident when we note that, on appeal, it has failed even to mention the remedial provision of the consent decree, which expressly empowers the court "to impose <u>any remedy authorized by law or equity, including</u> but not limited to an order ... awarding any damages, <u>costs and/or attorneys' fees</u> which may be occasioned by the City's violation of this Consent Decree."[9]  Indeed, the consent decree expressly permits these remedies, <u>regardless</u> of whether the City's violation is "willful or otherwise."

> Consent decrees have elements of both contracts and judicial decrees.  A consent decree embodies an agreement of the parties and is also an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.[10]

---

[8] 42 U.S.C. § 3614(d)(2) (2000) (emphasis added).

[9] We are not pleased by the fact that the City's appellate brief makes <u>no</u> mention of this critical aspect of the case and remind counsel of their ongoing duty of candor to the court. <u>See</u>, <u>e.g.</u>, <u>United States v. Shaffer Equip. Co.</u>, 11 F.3d 450, 457 (4th Cir. 1993) ("[A]ttorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case.").

[10] <u>Frew v. Hawkins</u>, 504 U.S. ---, 124 S.Ct. 899, 904 (2004) (internal quotations and citations omitted).

The City struck a deal with the government and bound itself to an enforceable judicial order. Insofar as the district court's authority to award attorney's fees to the government is concerned, we need to look no further than the plain language of the consent decree.

## 2. Award of Attorney's Fees to the Government at a Rate of $125 per hour.

In the alternative, the City contends that even if the district court was empowered to award attorney's fees to the government, it could not do so at a rate of $125 per hour. Rather, asserts the City, the court is limited to an hourly rate based on what the City characterizes as the government's "actual expense," i.e., an hourly rate determined by the government attorney's actual salary, which here amounts to approximately $55 per hour. The City complains that an award of any more would result in an unjustifiable "windfall" to the government.

We observe first that the vigor of our review of a district court's sanction award depends on the circumstances of the case. "If the sanctions imposed are <u>substantial</u> in amount, type, or effect, appellate review of such awards will be inherently more rigorous; such sanctions must be quantifiable with some precision."[11] We do not consider the total sanctions awarded

---

[11] <u>Topalian</u>, 3 F.3d at 936 (emphasis added) (quoting <u>Thomas v. Capital Security Svcs.</u>, 836 F.3d 866, 833 (5th Cir. 1988) (en banc)).

10

against the City of some $52,000 to be on the high end of the scale.

To put the quantum of this award in context, we note several representations made by counsel for the City in its Motion to Reinstate Appeal Dismissed for Want of Prosecution and to File Brief Out of Time — which we granted. In that motion, the City asserted that its counsel was unable to file the City's appellate brief timely, in part because of the substantial amount of responsibility on the city counsel's docket. Among those projects were a $12 million railroad depot renovation project, a $13 million purchase of a water filtration system, and a $40 million bond refinancing. In light of the magnitude of these projects, we find the City's position untenable. The City's own obstinance resulted in the waste of the government's, CA's, and the federal courts' time and resources. The City's conduct senselessly delayed CA's ability to provide services for which the uncontroverted evidence showed there to be a "critical need in the City." These considerations and the fact that the City did not even bother to file a reply brief on appeal, convince us that the sanctions imposed by the district court could hardly be considered "substantial."

The amount of the award, of course, must ultimately be determined by the district court on the facts of each case. When a court awards attorney's fees to the government as a sanction for an adverse party's improper conduct, however, we treat the hourly

11

rate in the local legal community as a benchmark for determining the amount of attorney's fees to be imposed. This conclusion is supported by the Supreme Court's ruling in <u>Blum v. Stenson</u>,[12] in which the Court held that "reasonable fees" under fee-shifting statutes such as 42 U.S.C. § 1988 "are to be calculated according to the prevailing market rates in the relevant community," regardless of whether the plaintiff is represented by a private law firm or a legal aid society.[13]

The Eighth Circuit and the Third Circuit have extended <u>Blum</u>'s reasoning to the instant context. In <u>United States v. Big D Enters., Inc.</u>,[14] the Eighth Circuit adopted the prevailing market rate standard for assessing reasonable attorney's fees in favor of the government in the context of Rule 37 sanctions:

> We see no reason why the government should not be able to recover a reasonable fee for its attorney's work calculated at the same rate that the attorney would be compensated by the prevailing local economy. In examining the hourly rate of the local legal community, it is irrelevant whether counsel seeking the attorney's fees is employed by the private or public sector. What matters is the attorney's experience and ability.[15]

The Third Circuit has reached the same result in the Rule 11

---

[12] 465 U.S. 886 (1984).

[13] 465 U.S. at 892-95.

[14] 184 F.3d 924 (8th Cir. 1999).

[15] <u>Id.</u> at 936.

12

context.[16]  In the absence of a more specific governing rule or agreement,[17] the same standard for assessing attorney's fees in favor of the government should apply across-the-board to all of the district court's sanction powers.[18]

Myron S. Lehtman, the attorney who represented the government in the district court, has been practicing law for almost 30 years. Although his hourly rate as determined by the local legal market is probably much higher, the government suggested — as a compromise — that it be reimbursed at a rate of $125 per hour, which is the rate specified in the Equal Access to Justice Act ("EAJA").[19]  The

_____

[16] See Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers, 855 F.2d 1080, 1092-93 (3d Cir. 1988) ("[W]e can perceive no difference between the situation of an Assistant U.S. Attorney and that of a public interest lawyer whose services, the Supreme Court has held, are to be valued at a market rate, even though he or she, like Assistant U.S. Attorneys, had no regular billing rate.") (citing Blum, 465 U.S. at 895).

[17] The consent decree says nothing about the rate at which the government could recover attorney's fees.  We, therefore, apply the standard that would normally govern the award of attorney's fees to the government as a sanction against the adverse party.

[18] See generally Topalian, 3 F.3d at 934-36 & n.5.

[19] 28 U.S.C.S. § 2412(d)(2)(A) (Law. Co-op. 2002) (limiting attorney's fees awarded under the EAJA to $125 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee"). The EAJA authorizes a court, unless expressly prohibited by statute, to award fees and expenses "to the prevailing party in any civil action brought by or against the United States or any agency or any official [thereof] acting in his or her official capacity." 28 U.S.C.S. § 2412(b).

government relied on the EAJA <u>only</u> to illustrate that its request for $125 per hour was reasonable. We are satisfied that the district court did not abuse its discretion in awarding attorney's fees to the government at a rate of $125 per hour.

### 3. Award of Damages to CA Equal to its Costs, Expenses, and Attorney's Fees.

The City's final contention on appeal is embodied in its challenge to the district court's award to CA of damages equal to its expenses, costs, and attorney's fees. The district court expressed two alternative justifications for concluding that an award of attorney's fees to CA was warranted. The district court's award to CA is appropriate under either approach.

#### a. CA as a "person aggrieved" or private plaintiff under the FHAA

Although CA never formally intervened in the contempt proceedings initiated by the government, the district court determined that CA could be characterized as a private plaintiff under the FHAA and therefore entitled to damages equal to its expenses, costs, and attorney's fees. CA could have intervened under 42 U.S.C. § 3614(e), but it did not — probably because the City threw in the towel even before the bell sounded for round one. A court may award a party who intervenes under § 3614(e) "such appropriate relief ... as is authorized to be granted to a plaintiff in a civil action arising under [§ 3613]."[20] Inasmuch as

---

[20] 42 U.S.C. § 3614(e).

14

CA could have intervened and sought these remedies, reasoned the district court, it could consider CA a private plaintiff and award it damages equal to its expenses, costs, and attorney's fees.[21]

Even absent intervention by CA, the district court was well within its power under the express authority of the FHAA to award CA its expenses, costs and attorney's fees.  In § 3614(d)(1)(B), the FHAA explicitly permits courts to "<u>award such other relief as the court deems appropriate, including monetary damages to persons aggrieved</u>."[22]  The district court did not exceed its power by awarding attorney's fees to CA, which was an "aggrieved person" within the meaning of the FHAA.[23]

> b. Award to CA of damages amounting to its expenses, costs, and attorney's fees for the City's willful violation of the consent decree

The district court concluded separately that CA was entitled to recover its expenses, costs, and attorney's fees for the City's willful disobedience of a court order.  The court relied on <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>,[24] in which the

---

[21] <u>See</u> 42 U.S.C. § 3613(c).

[22] In <u>United States v. Balistrieri</u>, the Seventh Circuit held that "§ 3614(d) allows the government to seek compensatory damages for an aggrieved person without that person's intervention." 981 F.2d 916, 928 (7th Cir. 1992).  We agree. "[N]othing in § 3614 expressly requires an aggrieved party to intervene before the court may award damages in a case brought by the Attorney General."  <u>Id.</u>

[23] <u>See</u> 42 U.S.C. § 3602(i) (defining "aggrieved person").

[24] 386 U.S. 714 (1967).

15

Supreme Court noted that "in a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the <u>fine</u> to be levied on the defendant."[25]   In response, the City invokes our decision in <u>Northside Realty Assoc., Inc. v. United States</u>[26] to argue that the district court lacked the authority to award a nonparty compensatory damages in a contempt proceeding.

i.   The <u>Northside Realty</u> Decision

At first blush, one can see why the City would seek refuge in this decision, as its facts resemble those before us.  On further examination, however, it becomes apparent that <u>Northside Realty</u> cannot carry the day.

In that case, the Appellant, Northside Realty Associates, Inc. ("Northside"), was held in civil contempt of a federal injunction

---

[25] <u>Id.</u> at 718 (emphasis added).  There is disagreement among the courts over whether a showing of "bad faith" or "willful disobedience" on the part of the contemnor is required to justify an award of attorney's fees.  <u>See</u> <u>Food Lion, Inc. v. United Food and Commercial Workers Intern. Union, AFL-CIO-CLC</u>, 103 F.3d 1007, 1017 n.14 (D.C. Cir. 1997) (collecting conflicting cases).  Our circuit, however, has consistently held that good faith is not a defense to a finding of civil contempt.  <u>See</u>, <u>e.g.</u>, <u>Chao v. Transocean Offshore, Inc.</u>, 276 F.3d 725, 729 (5th Cir. 2002); <u>Whitfield v. Pennington</u>, 832 F.2d 909, 913 (5th Cir. 1987); <u>Waffenschmidt v. MacKay</u>, 763 F.2d 711, 726 (5th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1056 (1986).  But this disagreement is irrelevant to our decision today, because abundant evidence supports the district court's finding that the City's violation of the consent decree was willful.  <u>See</u> <u>supra</u> Part I.

[26] 605 F.2d 1348 (5th Cir. 1979).

prohibiting Northside from discriminatory housing practices.[27] That injunction was issued in 1971 as a result of an FHA suit brought by the government.[28] In 1975, the government initiated civil contempt proceedings against Northside for violating the 1971 injunction and sought "additional injunctive relief and also monetary damages for nonparty victims of Northside's discrimination."[29] Following a bench trial, the district court held Northside in contempt and issued a new, expanded injunction in which the court "specified conditions of purging the contempt with monetary penalties and ordered certain affirmative remedial measures...."[30] The district court, however, denied the government's request for an award of monetary relief for nonparty victims of Northside's discriminatory practices. This refusal was grounded in United States v. Mitchell,[31] in which we had held that FHA enforcement actions brought by the government could not be used as vehicles for obtaining compensatory relief for victims.[32]

---

[27] Id. at 1350. Although the injunction extended to Northside as well as its agents, employees, and brokers, for simplicity's sake, we refer here only to Northside (in the singular).

[28] The injunction is reprinted in United States v. Northside Realty Assoc., Inc., 474 F.2d 1164, 1166 n.3 (5th Cir. 1973).

[29] 605 F.2d at 1350.

[30] Id. at 1351.

[31] 580 F.2d 789 (5th Cir. 1978).

[32] Id. at 793 ("As we read § 3613 the Attorney General is empowered to seek only equitable remedies. To broaden this

17

On appeal, the government in <u>Northside Realty</u> argued that even if <u>Mitchell</u> precluded the award of compensatory damages for Northside's nonparty victims, "compensatory damages for nonparty discriminatees may nonetheless be awarded in [a] civil contempt action."[33]   Thus, the government was attempting to use civil contempt proceedings indirectly to reach a result that we had refused to authorize directly in <u>Mitchell</u>.  We did not bite:

> [W]e would be reluctant to allow this civil contempt proceeding to be used, as the Government would have us do, to enlarge upon the original injunctive action by bringing in new parties with new issues in what would most likely be a new proceeding.  <u>The relief sought by the Government here cannot be characterized as merely an incidental part of the main cause.  It is an altogether new and different matter</u>.... [W]e now hold that here the Government may not be awarded compensatory damages for nonparties in a civil contempt action brought to enforce a § 3613 injunction.[34]

Our central concern in <u>Northside Realty</u> was that "absent [an] express congressional mandate,"[35] it would be imprudent to allow

---

limited grant of authority to include the power to seek legal damages would be a substantial departure from principles of equity and statutory interpretation.").  <u>See</u> <u>also</u> <u>United States v. Long</u>, 537 F.2d 1151, 1153-55 (4th Cir. 1975); <u>United States v. Rent-A-Homes Sys. of Ill., Inc.</u>, 602 F.2d 795, 797-98 (7th Cir. 1979); <u>United States v. Orlofsky</u>, 538 F. Supp. 450, 452-53 (S.D.N.Y. 1981).

[33] 605 F.3d at 1355-56.

[34] <u>Id.</u> at 1357, 1358 (emphasis added).  Before the FHA was amended by the FHAA in 1988, § 3613 was the provision governing enforcement actions by the attorney general.  <u>See</u> 42 U.S.C. § 3613 (1980).  Section 3613's amended counterpart in the current FHA is § 3614.  <u>See</u> 42 U.S.C. § 3614 (2000).

[35] <u>Id.</u> at 1358.

18

civil contempt proceedings to be used as a mechanism for achieving a result that could not be obtained in an original government enforcement action.[36]

> ii.  Expanded Enforcement Powers
> under the FHAA

In 1988, though, Congress passed the FHAA, which substantially amended the FHA and reshaped the landscape of fair housing actions brought under it.[37]  In addition to extending federal fair housing protection to handicapped persons and families with children, the FHAA considerably enhanced the federal government's enforcement powers.[38]  Enabling the government to seek the full panoply of legal and equitable remedies on behalf of nonparty victims of discrimination was a chief objective of the FHAA.[39]  The FHAA now

---

[36] To be sure, we recognized the limited application of our holding to the FHA context.  See id. at 1356 ("While we need not foreclose altogether the possibility of third party compensatory relief in civil contempt cases, we agree with the District Court that compensatory damages for nonparties ought not to be granted here as part of the Government's remedy in a civil contempt proceeding brought by the Attorney General to enforce a § 3613 injunction.").

[37] See supra note 1.

[38] See generally Eugene R. Gaetke & Robert G. Schwemm, Government Lawyers and Their Private "Clients" under the Fair Housing Act, 65 GEO. WASH. L. REV. 329, 329–45 (1997).

[39] See, e.g., id.; H.R. REP. NO. 100-711, at 16 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2177 ("Existing law has been ineffective because it lacks an effective enforcement mechanism. Private persons and fair housing organizations are burdened with primary enforcement responsibility.  Although private enforcement has achieved some success, it is restricted by the limited financial resources of litigants and the bar, and by disincentives in the law itself.  The Federal enforcement role is

19

permits the government to seek monetary damages and other remedies on behalf of "persons aggrieved."[40]   As explained by one federal court,

> Twenty years after the [original FHA] was passed, Congress amended the act to include express language providing for the award of monetary damages in housing discrimination suits brought by the Attorney General.  In doing so, the legislature expressly extended the statute to include the very provisions which the courts had refused to imply from the language of the [original FHA].[41]

By abrogating Mitchell,[42] Congress vitiated the central concern that governed our decision in Northside Realty — namely, the absence of specific congressional authority for the government to seek damages and other remedies for nonparty victims of housing discrimination. In contrast to what was permissible when Northside Realty was decided, the "relief sought by the Government" now can "be

---

severely limited.").  Compare 42 U.S.C. § 3613 (1980) (original FHA) with 42 U.S.C. §§ 3613(e), 3614 (2000) (current FHA as amended by the FHAA).

[40] 42 U.S.C. § 3614(d)(1)(B) (emphasis added).  See supra notes 22-23 and accompanying text.

[41] United States v. Rent America, Corp., 734 F. Supp. 474, 477 (S.D. Fla. 1990) (citing 42 U.S.C.A. § 3614(a), (d) (West Supp. 1989)).  See also id. at 476-77 ("It was clear under the [original FHA] that Congress had intended to limit the power of the Attorney General to the pursuit of equitable remedies only. Accordingly, the enforcement of the [original FHA] by the Attorney General was limited by its own terms.") (citing Long, 537 F.2d at 1155; Mitchell, 580 F.2d at 793).

[42] We believe that Long, 537 F.2d at 1153-55, Rent-A-Homes Sys., 602 F.2d at 797-98, and Orlofsky, 538 F. Supp. at 452-53, have also been abrogated by § 3614 of the FHAA.

20

characterized as merely an incidental part of the main cause."[43] No longer must it be "an altogether new and different matter."[44] As such, the City's reliance on <u>Northside Realty</u> is misplaced, and the district court's order that the City pay damages to CA equal to its expenses, costs, and attorney's fees was proper.

### III. CONCLUSION

The City's contumacious conduct was wholly inexcusable. We, therefore, affirm the district court's awards in all respects. AFFIRMED.

---

[43] <u>Northside Realty</u>, 605 F.2d at 1357.

[44] <u>Id.</u>