# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 24, 2008

No. 07-50706

Charles R. Fulbruge III
Clerk

UNITED STATES of AMERICA

Plaintiff - Appellee

v.

ALCOA, INC.

Defendant - Appellee

SANDOW POWER COMPANY LLC

Intervenor Defendant - Appellee

v.

NEIGHBORS FOR NEIGHBORS INC; PUBLIC CITIZEN INC

Appellants

NEIGHBORS FOR NEIGHBORS INC; PUBLIC CITIZEN INC

Plaintiffs - Appellants

v.

ALCOA INC

Defendant - Appellee

_____

07-50820

_____

UNITED STATES OF AMERICA

                                        Plaintiff - Appellee

v.

ALCOA INC;

                                        Defendant - Appellee

v.

NEIGHBORS FOR NEIGHBORS INC; PUBLIC CITIZEN INC

                                        Appellants
_____

NEIGHBORS FOR NEIGHBORS INC; PUBLIC CITIZEN INC

                                        Plaintiffs - Appellants

v.

ALCOA INC

                                        Defendant - Appellee

————————

Appeals from the United States District Court
for the Western District of Texas

————————

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    Alcoa produces from lignite fuel its own electricity for an aluminum plant in central Texas.   Three citizen groups sued Alcoa for alleged violations of the

2

Clean Air Act. The United States government also sued Alcoa. The suits were consolidated, and the district court entered a consent decree agreed to by all parties. Alcoa elected an option under the decree that permitted construction of a new power plant unit with specified emissions limitations. Sandow contracted to build the new unit and joined the decree. Alcoa failed to meet the decree deadline for commencing operation of the new plant. Over the citizen groups' objection, the district court entered an order agreed to by the government and Alcoa, giving Alcoa more time to build the plant and commence operation but enforcing other aspects of the construction and operation requirements. The order required more pollution control technology and stricter emissions limitations than originally agreed to, if the lower emissions rates were achievable. The citizen groups appealed.

I

Alcoa, under a voluntary emissions reduction permit approved and issued by the Texas Commission on Environmental Quality, operates an aluminum smelting plant in Rockdale, Texas, producing its own electricity for the plant. Neighbors for Neighbors, Inc., Environmental Defense, and Public Citizen, Inc. ("citizen plaintiffs") brought a citizen suit against Alcoa alleging violations of the Clean Air Act, and the United States filed its own claims. The complaints alleged, inter alia, that Alcoa modified three lignite-fired boilers at its plant without first obtaining pre-construction permits. The cases were consolidated, and the parties eventually agreed to a detailed consent decree, which the district court entered. The decree gave Alcoa three options: Alcoa could A) retrofit its existing plant technologies, labeled as the existing "Sandow units," B) build a new power plant ("replacement units") under an amended voluntary emissions reduction permit issued by the TCEQ, or C) shut down the existing plant and purchase electricity on the open market or build a new plant after obtaining a

3

new permit from the TCEQ.[1] The decree also gave broad enforcement powers[2] to the district court and required any modifications to be in writing and agreed to by all parties.[3] Alcoa chose Option B, which set deadlines for Alcoa to commence construction of replacement units at the plant, to shut down existing boilers, and to commence operation of the new units. Option B also specified emissions rate limits for the new plant[4] and incorporated the emission rates and limitations of Alcoa's amended voluntary emissions reduction permit into the decree.

Alcoa set out to construct a plant that would produce electricity for its facility and additional power to sell on the open market. After briefly commencing construction of one new facility, it changed course and entered into a contract with TXU Sandow Development Company, which later joined the consent decree, to build the replacement units. Facing a delay in construction and operation, Alcoa requested and received from the TCEQ an extension of the construction deadline in its amended voluntary emissions reduction permit. It also twice petitioned the court to modify or construe the deadlines within the decree; the court denied these petitions.

Having failed to meet Option B's operation deadline, Alcoa negotiated a stipulated order with the government. The order was amended following a

---

[1] Option C does not specify how Alcoa would obtain electricity after shutting down its plant, but these were the likely alternatives following shut-down.

[2] Paragraph 3 of the decree provides, inter alia, "The Court shall retain jurisdiction of this case after entry of this Consent Decree . . . to take any action necessary or appropriate for its enforcement, interpretation, execution, modification, or adjudication of disputes."

[3] Paragraph 161 of the decree provides that the decree "may be modified only by a subsequent written agreement signed by all the Parties and approved by the Court."

[4] The decree states, "Regardless of the emission rates and other limitations set forth in the Permit Amendment issued by TCEQ, Alcoa shall operate its Replacement Sandow Units to achieve and maintain 30-Day Rolling Average Emission Rates that are no less stringent than the following . . . : 0.10 lbs/mmBTU NOx, 0.20 lbs/mmBTU $SO_2$, and 0.015 lbs/mmBTU PM [particulate matter]."

public comment period and then entered by the district court over citizen plaintiffs' objections. The government, Alcoa, and Sandow agreed to approximately $1.8 million in penalties. Additionally, the stipulated order extended Alcoa's deadline for commencing operation of the new plant by approximately two and one-half years.[5] It required that the existing plant shut down earlier than originally required by the decree[6] and set stricter emissions limits for the new facility, provided they were achievable.[7] Finally, the order required installation of an additional piece of pollution reduction equipment, a selective catalytic reduction system to reduce nitrogen oxide emissions. The district court entered an amended order accepting the stipulated order with its stipulated penalties, incorporating the order into the consent decree, finding Alcoa to be in contempt of the decree, and assessing penalties and attorney's fees as a remedial measure for the contempt.

In the meantime, Alcoa applied to the TCEQ to build a plant with a megawatt capacity exceeding its voluntary emissions reduction permit. Plaintiff citizens argued before the district court that this violated the terms of the consent decree, as the consent decree incorporated all of the permit terms,

---

[5] The decree required commencement of operation of the first replacement unit by April 25, 2007, while the stipulated order set a deadline of August 31, 2009.

[6] The decree required Alcoa to shut down the existing units by April 25, 2007, while the stipulated order set a shut-down deadline of December 31, 2006.

[7] The order provided, "Beginning on February 28, 2011, Alcoa and TXU Sandow shall achieve and maintain at Sandow Unit 5 a 30-day Rolling Average Emission Rate for NOx [nitrogen oxides] of 0.080 lbs/mmBTU, unless Alcoa and TXU Sandow demonstrate that it is infeasible to achieve and maintain such a rate . . . . If Alcoa and TXU Sandow demonstrate that it is infeasible to maintain . . . [an emission rate] of 0.080 lbs/mmBTU, Alcoa and TXU Sandow shall submit to the Plaintiffs for review and approval an alternative NOx emission rate, which in no case shall be less stringent than 0.100 lb/mmBTU [the rate in the original Consent Decree]." The order made similar provisions for other emissions controls, stating, for example, in Paragraph 12, "From August 31, 2009, through February 28, 2011, Alcoa and TXU Sandow Alcoa shall . . . implement a program to optimize $SO_2$ reductions at Sandow Unit 5, in addition to any other $SO_2$ emission reduction measures set forth in the Consent Decree."

including the lower megawatt capacity. The district court held that the issue was for the state administrative process, not a federal forum. Plaintiff citizens appealed from this ruling and from the district court's entry of the stipulated order, urging that the order was a modification of the consent decree not agreed to in writing by all parties. At oral argument, citizen plaintiffs abandoned the issue of whether the higher megawatt capacity violated the consent decree and whether the court erred in holding that the issue was properly for the state administrative forum. This leaves us with the question of whether the court's acceptance of the stipulated order was a modification of the decree or a remedy and, if a remedy, whether the court abused its discretion in entering the provisions agreed to in the stipulated order.

II

Consent decrees are both contracts and legal instruments. In bargaining for the consent decree, citizen plaintiffs promised not to sue Alcoa provided it met the decree requirements, and Alcoa promised to meet the obligations of the decree option that it would elect to follow in order to reduce plant emissions. The contested decree provision is the deadline for commencing plant operation contained within Option B of the decree.[8] As we have discussed, Option B provided that Alcoa would construct and operate a replacement unit under an amended voluntary emissions reduction permit to be approved by the TCEQ, and would meet specified emission rates in operating the new unit. Option B incorporated into the decree the emissions rates and limitations that would be part of Alcoa's amended voluntary emissions reduction permit, as well as any limitations contained within subsequent amendments to that permit. Finally, it required that Alcoa commence construction of the first replacement unit

---

[8] Before the district court, Alcoa disputed whether it had missed the construction deadline but conceded that it would not meet the deadline for operation.

within 19 months after the issuance of Alcoa's amended permit and commence operation within 43 months of issuance.

Alcoa failed to meet the operation deadline.[9]  Pursuant to the stipulated order accepted by the court, Alcoa agreed to construct replacement units under its amended voluntary emissions permit, as originally required by Option B.[10] The order required Alcoa to commence operation of the new unit approximately two and one-half years later than Option B's deadline.  Alcoa also committed to shut down its existing units earlier than originally required by Option B,[11] construct an additional pollution control device not originally included within Option B, and to further reduce emissions where feasible.

In accepting the order, the court held that it was implementing a remedy, not modifying the decree.  We are not persuaded that this was an erroneous legal conclusion.  The court, as permitted by the decree[12] and its inherent power to

---

[9] The district court order accepting the stipulated order found that the parties all agreed that Alcoa had failed to meet the operation deadline but disputed whether it had missed the construction deadline.  The district court did not determine Alcoa's liability with respect to the construction deadline issue.

[10] The order provided, "By no later than August 31, 2009, Alcoa and TXU Sandow shall commence commercial operation of the Replacement Sandow Unit in accordance with the 2003 Voluntary Emissions Reduction Permit ('VERP Permit') issued by the Texas Commission on Environmental Quality ('TCEQ') in 2003 and Subsection C (Installation of Replacement Sandow Units – Option B) of Section IV (Pollution Controls and Reductions) of the Consent Decree."

[11] The order provided, "By December 31, 2006, Alcoa shall have completed a permanent shutdown of Sandow Units 1, 2, and 3 at Alcoa's Rockdale, Texas facility (the 'Existing Sandow Units') such that those units may not be operated again."

[12] Paragraph 3 of the consent decree provides,

> The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its enforcement, interpretation, execution, modification, or adjudication of disputes.  During the term of this Consent Decree, any Party may apply to the Court for any relief necessary to construe or effectuate this consent decree.

enforce that instrument, implemented a remedy that addressed one party's noncompliance with one of the decree's promissory terms. Although Alcoa missed the deadline originally agreed to and the stipulated order extended the deadline, the order accepted by the court substantially complies with the requirements that the parties originally bargained for under Option B of the consent decree. It gives Alcoa more time to construct the new units and begin operating them,[13] but the remainder of Option B remains in tact, with stricter pollution controls.[14] The contract doctrine of substantial performance with its offering of remedies short of a rescission of the contract informs the question of whether the district court "modified" the decree or offered a remedy for the failure to meet the construction deadline – the question we now turn to.[15]

---

[13] The stipulated order accepted by the court requires that "[b]y January 31, 2008, Alcoa and TXU Sandow shall deliver and unload the second of two boiler steam drums to the construction site for Sandow Unit 5 . . . . By no later than August 31, 2009, Alcoa and TXU Sandow shall commence commercial operation of the Replacement Sandow Unit in accordance with the 2003 Voluntary Emissions Reduction Permit . . . issued by the Texas Commission on Environmental Quality . . . in 2003 and Subsection C (Installation of Replacement Sandow Units – Option B) of Section IV (Pollution Controls and Reductions) of the Consent Decree."

[14] Plaintiff citizens argue that the question is not whether the controls within the stipulated order are stricter than those originally provided for in Option B but rather whether they are stricter than the controls that would likely result if Alcoa were required to obtain a prevention of significant deterioration permit. We do not address this issue, as we do not hold that Alcoa's failure to meet the deadline in Option B forced an immediate reversion to Option C. Rather, the question is whether the court adequately remedied Alcoa's failure to meet one provision within Option B, as we will discuss.

[15] See, e.g., WILLISTON ON CONTRACTS § 44:54 (discussing how courts, in considering substantial performance, consider, among other things, "the degree to which the purpose of the contract is defeated" and "the ease of correction"). The principles of avoiding forfeiture are also instructive. See RESTATEMENT (SECOND) OF CONTRACTS § 229 ("To the extent that a non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."). We recognize that "the rule [of substantial performance] does not apply where the deviations from the contract are such that an allowance out of the contract . . . would not give the other party essentially what he contracted for." WILLISTON ON CONTRACTS § 42:4. As we have discussed, citizen plaintiffs get all of the emissions reductions guaranteed under Option B, as well as the same plant guaranteed under that option. The difference is that the controls will commence at a later date, and the court has attempted to compensate for that

Citizen plaintiffs urge that the court's actions were a modification, not a remedy. In failing to meet the terms of Option B, they argue, Alcoa was left to follow Option C – to shut down and obtain power from the market, or obtain a new permit to construct a new power plant. However, the decree provides a remedy of monetary penalties. It does not set forth the course of action that Alcoa must follow if it failed to meet one of Option B's provisions. Instead, it states,

> Within twelve (12) months of the issuance of the Permit Amendment, Alcoa shall select one of the three pollution reduction options set forth below . . . and shall notify the Plaintiffs and TCEQ in writing as to which option Alcoa has selected for these Units. . . . After providing Plaintiffs and TCEQ with written notice of its selected approach, Alcoa shall implement the selected approach in compliance with the schedule set forth in this Consent Decree for that selected approach.

Rather than setting forth alternative requirements that would apply if Alcoa failed to meet the terms of its selected option, the decree then lists the specific terms of each option. Following the three options, the decree specifies interim pollution reduction measures, emissions monitoring requirements, limitations on Alcoa's use or sale of emission allowances if it participated in an emissions trading program, and other emission and permit requirements. Next, the decree provides that if Alcoa complied with the decree, it would not be liable for civil violations that occurred prior to the decree. It then sets forth citizen plaintiffs' commitments, stating that following the entry of the decree, "[a]s long as Alcoa remains in compliance with the deadlines . . . the Plaintiffs covenant

---

difference by requiring earlier shut-down of the existing plant, installation of an additional pollution control device, and stricter emissions rates. "The principle [of substantial performance, which is not a de minimis principle]. . . clearly recognizes that the plaintiff's departure from full performance has been of such pecuniary consequence that a deduction must be made for the injury to the defendant." Id. The court has made such deductions by accepting the additional emissions controls in the stipulated order.

not to sue Alcoa and its successors and assigns for civil claims . . . at the Existing Sandow Units or Replacement Sandow Units" for certain physical changes. Next, the decree lists requirements for period reporting, environmental mitigation projects, and civil penalties to be paid by Alcoa. The only provisions addressing the consequences of Alcoa's failure to meet the terms of the elected option – apart from the Force Majeure clause and provisions for dispute resolution – appear after the civil penalties, in the "Stipulated Penalties" portion of the decree.

The "Stipulated Penalties" section provides, inter alia, that if Alcoa failed to "commence physical, on-site construction" of the control devices under Option A or Option B, or failed to shut down the devices according to schedule as required by Option C, that Alcoa would pay either $2,500 per day directly to the United States for each day that it failed to meet the construction or shut-down schedule, or $5,000 per day into an escrow account. This section does not provide that Alcoa would lose its elected option if it failed to meet the schedule contained within that option.

In the absence of any provision stating that Alcoa would be forced to revert to an alternative option if it failed to meet the schedule of the option that it selected, we are not persuaded that the court's entry of the stipulated order, establishing new deadlines under Option B and specifying new emission rates, was a modification of the decree. Rather, it was a remedy for Alcoa's failure to meet one obligation under Option B, namely the deadline for commencing operation of the new power unit.

Courts should not impose their own terms within a consent decree and should read consent decree terms by their plain meaning.[16] At the same time, consent decrees are more than contracts. They are also enforceable judicial

---

[16] See, e.g., United States v. Chromalloy Am. Corp., 158 F.3d 345, 350 (5th Cir. 1998).

orders.  Nothing in the plain meaning of the decree requires Alcoa to revert to Option C if it violates one obligation of Option B, the option it elected to follow. And the cases cited by citizen plaintiffs for the proposition that courts are to interpret decrees by their terms and enforce them as such are not inevitably in tension with a court's efforts to construct and implement a remedy for violation of a consent decree.   In United States v. Chromalloy American Corp., one party to a consent decree attempted to partially reimburse the other party, despite a provision of the decree requiring full reimbursement.  We read the decree by its plain meaning and held that full reimbursement was required.[17]  This does not conflict with the district court's holding in the present case, holding Alcoa in contempt for violating the decree terms and implementing remedies to counteract contempt.  Nor does Cook v. Ochsner Foundation Hospital, where we affirmed a district court's order of contempt for violation of a consent decree and assessment of attorney's fees, damages, and costs to the wronged party.[18] Similarly, in Ho v. Martin Marietta Corp., a worker settled with an employer and, in a consent decree, gave up his rights to bring any future claims against the employer arising from his employment and termination of employment.[19] Ho then attempted to bring a workers' compensation claim, and a magistrate judge held him to the terms of the decree, requiring him to drop the claim or return the money that he had received in exchange for settlement.[20]  We affirmed.[21]

These cases reinforce the principle that district courts have the power and ordinarily must hold parties to the terms of a consent decree.  The district court,

---

[17] Id.

[18] 559 F.2d 270, 271 (5th Cir. 1977).

[19] 845 F.2d 545, 546 (5th Cir. 1988).

[20] Id. at 547.

[21] Id. at 549.

in holding Alcoa in contempt for failing to meet a deadline within the decree and then issuing a remedy, did not violate this core principle. And by these cases, district courts have wide discretion to enforce decrees and to implement remedies for decree violations. In Ho, we held that "[o]nce the district court enters the settlement as a judicial consent decree ending the lawsuit, the settlement takes on the nature of a judgment"[22] and that "the district court's decision to discourage Ho's worker's compensation claim was . . . a common exercise of a federal court's right to protect its own final judgments."[23] And in Cook we held, "Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt. Discretion . . . . must be left to a court in the enforcement of its decrees."[24] In Cook we further observed that "[i]n ordering the award of attorneys' fees . . . the court is merely seeking to insure that its original order is followed."[25] By definition, the district court in this case could not order compliance with the original schedule after Alcoa failed to meet it.

That said, in certain contexts, establishing a new deadline under a decree, as the court did here as part of its remedy, can be a modification. In United States v. Wayne County Michigan, for example, the Sixth Circuit affirmed the district court's denial of a motion to extend by a year the county's deadline for sealing a sewage bypass point, finding no changes in factual circumstances or in law to justify the requested modification.[26] In United States v. Krilich, a developer's failure to commence excavation and grading of a wetland to mitigate

---

[22] Id. at 548.

[23] Id. at 549.

[24] 559 F.2d at 272.

[25] Id.

[26] 369 F.3d 508, 510-11, 513-516 (6th Cir. 2004).

the impacts of the development was an improper attempt to modify the decree, where the Government had made "clear statements" "that it was not relieving him of deadlines."[27]  In that case, the issue was whether the Government had implicitly extended the deadlines "through its course of conduct," an argument that the Seventh Circuit rejected.[28]  Here, however, the deadline for operation is one provision within a broader, comprehensive requirement for the construction of a new power plant.  The district court's entry of the stipulated order as a remedy, maintaining most obligations of that comprehensive requirement and strengthening some, was not in error.

III

We turn now to the court's discretion in implementing the remedy,[29] and find no abuse of that discretion.

The decree gave the court broad enforcement powers, providing in paragraph 3,

> The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its enforcement, interpretation, execution, modification, or adjudication of disputes.  During the term of this Consent Decree, any Party may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.[30]

---

[27] 126 F.3d 1035, 1036-37 (7th Cir. 1997).

[28] Id. at 1036.

[29] Am. Airlines, Inc. v. Allied Pilots Ass'n, 228 F.3d 574, 578 (5th Cir. 2000) (citing Martin v. Trinity Indus., Inc., 959 F.2d 45, 46 (5th Cir.1992)) ("We review contempt findings and damage awards for contempt for abuse of discretion.").

[30] Emphasis added.

13

In addition to this express authority, the district court has powers "inherent in the jurisdiction of the chancery" to effectuate a consent decree.[31] As we have held in addressing a district court's finding of contempt and imposition of attorney's fees and costs under a consent decree,

> Consent decrees have elements of both contracts and judicial decrees. A consent decree embodies an agreement of the parties and is also an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.[32]

By striking a deal with Alcoa and the government in the consent decree, plaintiff citizens "bound . . . [themselves] to an enforceable judicial order."[33] Consent decrees are judgments despite their contractual nature,[34] and district courts may fashion remedies to "enforce prior judgments."[35] These remedies need not match those requested by a party or originally provided by the court's earlier judgment.[36]

Citizen plaintiffs argue that the court, in extending the operation deadline under Option B, "rewarded – rather than purged – Alcoa's contempt." To the

---

[31] United States v. Swift & Co., 286 U.S. 106, 114 (1932).

[32] United States v. Cty. of Jackson, 359 F.3d 727, 732 (5th Cir. 2004); see also Chromalloy, 158 F.3d at 349 (citations omitted) ("A consent decree is akin to a contract yet also functions as an enforceable judicial order."); Baylor v. United States Dep't of Housing and Urban Dev., 913 F.2d 223, 225 (5th Cir.1990) (citations omitted) (holding that "[a] consent decree is a judicial order").

[33] Cty. of Jackson, 359 F.3d at 732.

[34] See Swift, 286 U.S. at 115 ("We reject the argument . . . that a decree entered upon consent is to be treated as a contract and not as a judicial act.").

[35] Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 577 (5th Cir. 2005).

[36] Id. at 570, 578-79 (discussing how the district court's injunction denied the motion for sanctions and contempt but issued other remedies that built on the court's original injunction, and partially affirming the district court's order).

contrary, the district court found, without clear error,[37] that the additional remedies imposed under Option B by the stipulated order, including a pollution reduction unit, an earlier shut-down deadline, and more stringent emissions limitations than originally provided for in the option, reduced more emissions than did the original Option B[38] and imposed substantial burdens on Alcoa.[39] Nor did the district court rely on erroneous legal conclusions in implementing the remedy.

AFFIRMED.

---

[37] We review the facts supporting a district court's contempt order for clear error, and the conclusions of law de novo. See Am. Airlines, 228 F.3d at 578 (citing Petroleos Mexicanos v. Crawford Enters., Inc., 826 F.2d 392, 401 (5th Cir.1987)) ("The district court's underlying findings of fact are reviewed for clear error and its underlying conclusions of law reviewed de novo.").

[38] The court ordered separate monetary penalties specifically to "purge . . . [Alcoa's] contempt." With respect to the stipulated order it found, "[T]he environmental improvements mandated by the Stipulated Order are substantial and include a legally enforceable commitment to install new emission control technology at a plant not even addressed by the Consent Decree, as well as legally enforceable commitments to optimize emissions controls at the Replacement Sandow Unit to the lowest possible levels." 2007 WL 628710 at *5. The record shows that Option B requires 30-Day Rolling Average Emission Rates of 0.10, 0.20, and 0.015 lbs/mmBTU of NOx, $SO_2$, and particulate matter, respectively. The stipulated order sets lower 30-Day Rolling Average Emission Rates of 0.08 and 0.150 lbs/mmBTU for $SO_2$ and NOx, provided they are feasible, and requires Alcoa and TXU to demonstrate the infeasibility of these rates if they believe that they are not achievable, in which case Alcoa and TXU Sandow "shall submit to the Plaintiffs for review and approval of an alternative . . . emission rate, which in no case shall be less stringent" than the rate provided for in the consent decree. The stipulated order also requires installation and operation of a selective catalytic reduction system, Sandow Unit 4, while Option B of the consent decree does not have this requirement. Plaintiffs argue that the relevant issue is whether the stipulated order imposes stricter emissions limitations than would have Option C, had Alcoa been forced to follow that option after it violated one provision of Option B. As we have discussed, a violation of one provision of Option B did not force reversion to Option C, so the comparison is unnecessary.

[39] The court found, "These improvements will require a significant outlay of time and expense by Defendants . . . ." 2007 WL 628710 at *5. This is not clearly erroneous in light of the additional pollution control system that Alcoa must install as well as the stricter emissions rates and earlier shut-down deadline that it must meet under the stipulated order.