Ronald CHISOM, et al., Plaintiffs

v.

Bobby JINDAL, et al., Defendants.

Civil Action No. 86–4075.

United States District Court,
E.D. Louisiana.

Sept. 1, 2012.

Ronald Lawrence Wilson, Ronald L. Wilson, Attorney at Law, William Patrick Quigley, Davida Finger, Loyola Law School Clinic, New Orleans, LA, for Plaintiffs.

Merietta Spencer Norton, Secretary of State, Elizabeth Baker Murrill, State Of Louisiana–Office of the Governor, Baton Rouge, LA, Kevin Richard Tully, Elizabeth Skelly Cordes, Esmond Phelps Gay, Howard Carter Marshall, Christovich & Kearney, LLP, New Orleans, LA, for Defendants.

## ORDER AND REASONS

SUSIE MORGAN, District Judge.

Before the Court are several pending motions: (1) plaintiff-intervenor Justice Bernette Johnson's ("Justice Johnson") "Motions to (A) Reopen Case, (B) to Join as Defendants Justices Kimball, Victory, Knoll, Weimer, Guidry, and Clark of the Louisiana Supreme Court, (C) for Contempt Against Justices Kimball, Weimer, Guidry, and Clark;"[1] (2) a "Motion to Reopen and Enforce Consent Decree, to Add Defendants, and to Stay Proceedings in the Louisiana Supreme Court"[2] filed by

---

1. R. Doc. 137. In the body of her pleading, Justice Johnson also requests a restraining order against the other six justices of the Supreme Court.

2. R. Doc. 146. In the body of their pleading, the *Chisom* Plaintiffs also ask that the six individual justices of the Supreme Court, other than Justice Johnson, be held in contempt and request injunctive relief.

plaintiffs Marie Bookman, Ronald Chisom, and Marc Morial (collectively, the *"Chisom* Plaintiffs"); (3) a "Motion to Stay Proceedings"[3] filed by Justice Johnson and the *Chisom* Plaintiffs; (4) a "Motion for Voluntary Dismissal"[4] filed by Justice Johnson; and (5) a "Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(B),"[5] filed by the State of Louisiana (the "State"), Office of the Governor, and Governor Bobby Jindal ("Governor Jindal") (collectively, the "State").

In addition to the above motions, plaintiff-intervenor the United States of America ("United States") filed a "Memorandum in Support of Motions to Include *Chisom* Service Toward Any Calculation of Tenure on the Louisiana Supreme Court"[6] and the NAACP Legal Defense and Educational Fund, Inc. ("NAACP") filed, as an amicus curiae, a brief "In Support of Plaintiffs and Plaintiff–Intervenors for the Inclusion of Justice Bernette J. Johnson's Years of Service as the Chisom Justice In the Calculation of Her Seniority on the Louisiana Supreme Court."[7] The City of New Orleans also filed an amicus curiae brief in support of Justice Johnson and the *Chisom* Plaintiffs.[8] A more detailed look at the flurry of pleadings filed in this matter over the course of the last two months will follow.

Justice Johnson's and the *Chisom* Plaintiffs' motions to reopen both are considered as motions to interpret the Consent Judgment entered into by the parties and approved by the Court on August 21, 1992, 970 F.2d 1408 (5th Cir.1992),[9] as amended on January 3, 2000 ("Consent Judg-

ment").[10] The Court finds that the interpretation of the Consent Judgment is within its inherent jurisdiction. For the reasons set forth below, the motions to interpret the Consent Judgment are granted and the State's motion to dismiss those same motions is denied. The Court finds that the Consent Judgment provides for Justice Johnson's service on the Louisiana Supreme Court ("Supreme Court") from November 16, 1994, to October 7, 2000, to be credited to her tenure on the court for all purposes under Louisiana law. As the Supreme Court held in *Perschall v. State*, 96–322 (La.7/1/97), 697 So.2d 240, 260, the State, including the Supreme Court as an arm of the State, is bound by the terms of the Consent Judgment.

Justice Johnson's and the *Chisom* Plaintiffs' motions for involuntary joinder and contempt are denied. Justice Johnson's and the *Chisom* Plaintiffs' motion for a stay of the Supreme Court is denied as moot. Justice Johnson's and the *Chisom* Plaintiff's motions for injunctive relief are denied. Justice Johnson's motion to substitute Governor Jindal as a party is dismissed as moot. Justice Johnson's motion for voluntary dismissal is granted with respect to Jerry M. Fowler in his Capacity as Commissioner of Elections of the State of Louisiana and with respect to James H. Brown in his Capacity as Secretary of the State of Louisiana. Likewise, Justice Johnson's motion for voluntary dismissal of the claims against the Office of the Secretary of the State of Louisiana is also granted.

**3.** R. Doc. 159.

**4.** R. Doc. 173.

**5.** R. Doc. 197.

**6.** R. Doc. 183.

**7.** R. Doc. 206.

**8.** R. Doc. 216.

**9.** *See* R. Doc. 120.

**10.** *See* R. Doc. 135.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

In 1986, the *Chisom* Plaintiffs, along with three other registered voters in Orleans Parish, Louisiana, and a nonprofit voter education group, filed a class action complaint against three Louisiana officials in their official capacities, seeking to change the State's method for electing justices to the Supreme Court. By suing these officials in their official capacities, the *Chisom* Plaintiffs were in effect suing the State.[11] At the time, the system for electing justices was contained in La.Rev. Stat. § 13:101, which provided that the State was divided into six "Supreme Court Districts," with five of the six Supreme Court Districts electing one justice each, and the other district, the "First Supreme Court District," electing two justices. The First Supreme Court District, which included four parishes,[12] elected two "at-large" justices. The *Chisom* Plaintiffs argued that this system impermissibly diluted the voting strength of the minority voters in Orleans Parish, in violation of the Voting Rights Act of 1965, 42 U.S.C. § 1973.[13]

After six years of litigation, involving numerous appeals to the U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit") and one successful appeal to the U.S. Supreme Court, the parties entered into a Consent Judgment, and Judge Charles Schwartz signed the document on August 21, 1992. The efficacy of the Consent Judgment was contingent upon legislation being enacted by the Louisiana Legislature to codify its terms. Act 512 of 1992 was duly enacted and went into effect on June 22, 1992.

In 1995, New Orleans attorney Clement Perschall, Jr. sued the State, alleging that Act 512, which created an extra seat on the State's Fourth Circuit Court of Appeals and called for the Supreme Court to immediately assign the judge elected to that seat to the Supreme Court, violated the Louisiana Constitution of 1974. The Supreme Court agreed with Perschall and held Act 512 to be unconstitutional, but found that the State was still obligated to comply with the Consent Judgment, saying:

> We realize that Act 512 does not exist in a vacuum. The State argues, and we agree, the Act and the Chisom Consent Judgment are separate and independent methods by which the negotiated remedy was implemented. Although the Act falls by this judgment, we recognize the status quo remains intact under the Chisom Consent Judgment. Consequently, this court as it is currently composed shall continue to function as a de jure court with its actions valid and effectual. We emphasize that the court-approved settlement in *Chisom*, which is under the jurisdiction of the United States District Court for the Eastern District of

---

**11.** *See Karcher v. May*, 484 U.S. 72, 78, 108 S.Ct. 388, 98 L.Ed.2d 327 (1987) ("[T]he real party in interest in an official capacity suit is the entity represented and not the individual officerholder.").

**12.** These parishes are: Orleans, which had, and still has, a majority minority population, and Jefferson, St. Bernard, and Plaquemines, which had, and still have, majority white populations.

**13.** 42 U.S.C. 1973, as amended ("Section 2"). As amended in 1982, section 2(a) prohibits the imposition of a voting qualification or prerequisite or standard, practice, or procedure that "results in a denial or abridgment of the right ... to vote on account of race or color," and section 2(b) states that the test for determining the legality of such practice is whether, "based on the totality of circumstances," minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

Louisiana, is not affected by this judgment.

*See Perschall,* 697 So.2d at 260.

In reaching its conclusion in *Perschall,* the Supreme Court recounted the history of Act 512, as follows:

**Act 512 of 1992: Origins and Purpose**

In the 1992 Regular Legislative Session, Senator Charles D. Jones filed Senate Bill 1255, proposing to divide the first and third districts of the Court of Appeal, Second Circuit into two elections sections, each having one section with a majority black population and voter registration. In this original form, SB 1255 was read for the first and second time by title and referred to the Senate Judiciary A Committee, which discussed the bill in open committee on June 2, 1992. Senator Jones, together with Judge Bill Roberts, testified before the committee, and proposed a sweeping amendment to the bill which placed it largely in the posture that it finally passed the legislature and became Act 512. The clear purpose of the amendment, reflected by hearing transcripts, was to draft and pass legislation to aid in effectuating settlement of the *Chisom* case then pending before the Fifth Circuit. Before the committee, Judge Roberts explained:

Senator Kelly: Does this settle the Chisom case?

. . . .

Judge Roberts: This is part of it. We then have to have a Consent Decree approved by the Fifth Circuit and Judge Schwartz. This is a part of it, but we felt that we needed to get the bill out and on the floor so that-because its going to take us a few more days. We have worked on drafts, we have met with the Supreme Court a couple of times. I've had conversations with lawyers for the plaintiffs.

We have not yet agreed on any exact wording on *Chisom.* If we do not agree, this bill is ineffective. If you notice there is a provision in the amendment that provides that unless—if the matter is not settled, then this bill is null and void.

Minutes at 55, Louisiana State Senate, Judiciary A Committee (June 2, 1992). The exigency that Judge Roberts alluded to was prompted by the fact that while the legislature was in session, all parties involved in *Chisom* were attempting to settle the lengthy *Chisom* litigation. Senator Jones later explained to the committee that during the month of June 1992, the Justice Department was going to review drafts of the consent decree and "this bill", and "the person who's [sic] over the entire Civil Rights Division for the Department of Justice is going to pass on it." *Id.* Therefore, the bill's sponsor was attempting to place this legislation on the fast track to aid in effectuating settlement. Thus, the parties sought concurrent enactments to effectuate the case's settlement: (1) a legislative act, and (2) a federal consent judgment memorializing such act.

With that backdrop, the substantive amendments to SB 1255, converting the second circuit reapportionment bill to a supreme court reapportionment bill, consisted of a two-fold enactment. First, the bill would enact La.R.S. 13:101.1, relative to reapportionment of supreme court districts. Section 101.1 created a supreme court district comprised of Orleans Parish for the purpose of electing a justice, which justice would take office in the newly created district on January 1, 2000, or earlier if a vacancy occurred in the first supreme court district before January 2000. The section also instructed the legislature to

reapportion the supreme court into seven districts in the 1998 Regular Session based on the most current census data.[14] These new districts would become effective on January 1, 2000 for elections occurring on or after January 1, 2000. Lastly, section 101.1 provided that the justices holding office on the effective date of the Act, June 22, 1992, would not be affected by section 101.1. In addition, retirement benefits provided by La. R.S. 11:558(A)(5)(a)(ii) were extended to each justice holding office as of June 22, 1992.[15]

The second substantive amendment to SB 1255 proposed in committee was the enactment of La.R.S. 13:312.4. In short, section 312.4 created the "*Chisom* seat." [16] Section 312.4 would create an additional judgeship for the Court of Appeal, Fourth Circuit. The section provided that an election to this seat would take place in the 1992 congressional primary election, with the term of office commencing January 1, 1993. The section provided that pursuant to the power vested in the supreme court by La. Const. art. V, § 5(A), the judge elected to the fourth circuit seat would immediately be assigned by the supreme court to sit on the supreme court. While assigned, the section instructed that the judge would "participate and share equally in the cases and duties of the justices of the supreme court during the period of assignment. Further, the judge shall receive the same compensation, benefits, expenses, and emoluments

of office as are now or as may hereafter be provided by law for justices of the Louisiana Supreme Court." Section 312.4 contained an expiration provision that would dissolve the "*Chisom* seat" on the first of two occurrences: (1) once a justice takes office in the new Orleans Parish district before January 2000 upon a vacancy in the first district, or (2) once a justice takes office in the new Orleans Parish district after being elected in the regular supreme court election held in the year 2000.

Finally, the amendments to SB 1255 provided that the legislation would be voided and of no effect if a consent decree in the *Chisom* case was not entered into in federal court. The Act would become effective on the governor's signature.

On June 2, 1992, the Senate committee approved SB 1255 as amended. The full Senate called the bill out of its regular order and passed it by a vote of 36 yeas, 2 nays, and 1 abstention on June 4, 1992. The House and Governmental Affairs Committee held hearings on the bill on June 9, 1992. The House committee reported the bill favorably, and with only a technical amendment, by a 12–0–1 vote. The full House called SB 1255 out of its regular order and passed it on June 16, 1992 by a 85–14–6 vote. The Senate concurred in the House amendments by a vote of 38–0–1 on June 18, 1992. The bill was signed into law on

---

14. With regard to the new Orleans Parish district, section 101.1 specifically provided that if a first district vacancy occurred after the 1998 reapportionment but before January 1, 2000, the special election to fill the vacancy would occur in the Orleans district. [footnote 7 in the Supreme Court's original opinion].

15. The retirement benefits authorized by La. R.S. 11:558(A)(5)(a)(ii) are also known as "Act 1063" benefits, referring to La. Acts

1991, No. 1063. [footnote 8 in the Supreme Court's original opinion].

16. The judge first elected to fill the seat authorized by section 312.4 was the Honorable Revius O. Ortique, Jr., and its current occupant is the Honorable Bernette Joshua Johnson. [footnote 9 in the Supreme Court's original opinion].

June 22, 1992 by Governor Edwin W. Edwards and became Act 512.

On August 21, 1992, all parties involved in the *Chisom* case, as well as the federal district judge, signed a Consent Judgment in the United States District Court for the Eastern District of Louisiana. The district court's order stated that the Consent Judgment "memorializes" La. Acts 1992, No. 512 and effectively closed the *Chisom* case. That same day, the Fifth Circuit remanded the case to the federal district court to effectuate settlement. In October 1992, with the Consent Judgment having been approved, the Fifth Circuit dismissed the appeal in the *Chisom* case, which was on remand from the United States Supreme Court. *Perschall*, 697 So.2d at 245–247.

After the Supreme Court found Act 512 unconstitutional, but held that the State is nevertheless bound by the Consent Judgment, Judge Schwartz dismissed Perschall's remaining federal claims, over which he had retained jurisdiction, as moot. *Perschall v. State*, No. 95–1265, 1997 WL 767703, at *5 (E.D.La. Dec. 10, 1997). The Fifth Circuit affirmed the dismissal of Perschall's remaining federal claims. *Perschall v. State*, 174 F.3d 197 (5th Cir. 1999). In October 1997, Justice Johnson filed a successful motion to intervene in this action, even though the Supreme Court had ruled that the State is bound by the terms of the Consent Judgment, as she expressed concerns about being able to remain in the *Chisom* Seat until an election could be held in 2000.[17] Supreme Court Justice Jeffrey Victory ("Justice Victory") was an Associate Justice of the Supreme Court at that time, but did not request that he be allowed to intervene.

On May 6, 1997, before the Supreme Court's opinion was handed down in *Perschall*, the Louisiana House of Representatives unanimously approved House Bill No. 580 containing a proposed amendment to the Louisiana Constitution.[18] House Bill No. 580 proposed a number of changes, including the division of the State into seven Supreme Court Districts and a provision that "any tenure on the supreme court gained by a judge of a court of appeal temporarily assigned by law to the supreme court while so assigned to the supreme court shall be credited to such judge."[19] On May 8, 1997, House Bill 580 was sent to the Louisiana Senate Committee on Senate and Governmental Affairs.[20] Apparently, House Bill 580 was not brought up for a vote in the State Senate sub-committee and the proposed constitutional amendment was never put before the voters of the State.

Meanwhile, House Bill No. 581, 1997 Reg. Sess. (La.1997), after being unanimously approved by the State House of Representatives on May 6, 1997, was approved by the State Senate on July 10, 1997, and signed into law by the governor on that date as Act 776 of 1997 ("Act 776"). Act 776 provided for the formal and permanent reapportionment of the State's Supreme Court Districts, as called for by the terms of the Consent Judgment.[21] Act 776

---

17. *See* R. Doc. 130. Justice Johnson's Motion to Intervene stated that *Chisom* was consolidated with *Perschall*, but that is not correct. The two cases were never consolidated in this Court.

18. H.B. 580, 1997 Reg. Sess. (La.1997).

19. *Id.*

20. HB 580: History, 1997 Reg. Sess. (La. 1997), http://www.legis.state.la.us/.

21. In 1993, Article 3, Section 2 of the Louisiana Constitution was amended to read that only fiscal issues could be addressed in legislative sessions taking place during even-numbered years. *See* S.B. 83, 1993 Reg. Sess. (La.1993). Accordingly, the issue of reappor-

amended La.Rev.Stat. § 13:101 to read that "the state shall be divided into seven supreme court districts" and that "the supreme court shall be composed of one justice elected from each of the seven districts." Act 776 also amended La.Rev. Stat. § 13:101.1 by assigning those justices sitting on the Supreme Court as of January 1, 1999, to the seven newly created Districts. Finally, Act 776 amended La. Rev.Stat. § 13:312.4, providing that the "temporary additional judgeship" on the Fourth Circuit Court of Appeals would expire on "the date that a justice of the supreme court takes office after being elected in a special election called for the office of justice of the supreme court which is held in District 7 ... or from the date that a justice takes office after being elected in the regular supreme court election held in the year 2000 from District 7, whichever occurs first." Importantly, Act 776 further provides that "[a]ny tenure on the supreme court gained by such judge while so assigned to the supreme court shall be credited to such judge." Act 776, effective January 1, 1999, also provides that it "shall not affect any election held prior to that date, except that if and when a vacancy occurs prior to January 1, 1999, in the office of either justice of the first supreme court district as [then] constituted, the provisions of R.S. 13:101 (District 1) and (District 7) and 101.1(D) shall become effective immediately upon the occurrence of the vacancy."

In December 1999, certain parties in this action [22] moved to add Act 776 as an "addendum" to the Consent Judgment.[23] The parties explained that, despite the fact that the newly created Seventh Supreme Court District was not drawn exactly as contemplated by the Consent Judgment (i.e., the Seventh District was not the entirety of Orleans Parish), and despite the fact that the legislation reapportioning the Supreme Court Districts was enacted in 1997 instead of 1998 (which, as explained above, was due to a change in the way the State Legislature conducted its business), "all parties agree[d] to modify the Consent Judgment so that it reflects the intent of the parties to accept Act 776 (1997) as an addendum to the Consent Judgment." [24] On January 3, 2000, Judge Schwartz granted this request, and Act 776 was formally added as an addendum to the Consent Judgment.[25]

tionment of the State's Supreme Court Districts could not take place in 1998 as originally contemplated by the terms of the Consent Judgment and, instead, was taken up in 1997. In 2002, Section 2 of the Louisiana Constitution was amended again to read that odd-numbered years would be limited to fiscal issues only. *See* S.B. 4, 2001 Reg. Sess. (La. 2001).

**22.** The signatories to the motion to amend the Consent Judgment were: Assistant Attorney General Angie Rogers Laplace, on behalf of then-Louisiana Attorney General Richard Ieyoub; William Quigley, counsel for the *Chisom* plaintiffs; Assistant Attorney General Robert Kengle on behalf of Anita Hodgkiss, a Deputy Assistant Attorney General with the U.S. Department of Justice; then-Governor of the State of Louisiana Mike Foster; Cheney Joseph, then-Governor Foster's Executive Counsel; Allan Kanner, counsel for intervenor Justice Pascal Calogero; Peter Butler, counsel for intervenor Justice Walter Marcus; W. Fox McKeithen, then-Secretary of the State of Louisiana; and Jerry Fowler, then-Commissioner of Elections for the State of Louisiana.

**23.** *See* R. Doc. 135.

**24.** *Id.*

**25.** *See id.* The "tenure" provisions in Act 776 do not appear in the West version of Louisiana Revised Statute 13:312.4, but do appear in the statutory notes immediately following the statute. It is unclear why this language was left out of the West version of the statute, but this appears to be an editing error by West Publishing. Regardless, the parties acknowledge that Act 776, as it was passed by the Legislature, is the law and controls. Fur-

Later in 2000, Justice Johnson ran unopposed and was elected to the newly created position of Associate Justice of the Supreme Court from the Seventh Supreme Court District. Justice Johnson was re-elected to this position, again after running unopposed, in 2010. Justice Johnson argues that she has been a full-fledged Justice of the Supreme Court for all purposes since her swearing in on November 16, 1994.[26]

The Chief Justice of the Supreme Court Justice Catherine Kimball ("Justice Kimball") has announced her intention to resign from the Supreme Court effective January 31, 2013. Both Justice Johnson and Justice Victory have asserted a right to succeed Justice Kimball. Justice Johnson was elected in 1994 and sworn in on November 16, 1994.[27] Justice Victory was elected to the Supreme Court in 1994 and sworn in on January 1, 1995. Justice Johnson believes that the Consent Judgment provides that the time she served from November 16, 1994, to October 7, 2000, when she was elected as an Associate Justice for the newly created Seventh Supreme Court District, is to be credited to her tenure for all purposes, including determining Justice Kimball's successor. If Justice Johnson's tenure during this time is not credited, Justice Victory will be the next Chief Justice, followed by Justice Jeannette Knoll ("Justice Knoll"), who was sworn into office on January 1, 1997.[28] Like Justice Victory, Justice Knoll has not intervened in this action to assert a position.

On June 13, 2012, the Supreme Court issued the following Order:

Acting under the authority of Article V of the Louisiana Constitution of 1974, and the inherent power of this Court, and considering that contrary legal positions have been expressed on the issue of who will succeed to the office of Chief Justice of the Louisiana Supreme Court upon the retirement of present Chief Justice Catherine D. Kimball on January 31, 2013,

And further considering that the administration of justice requires a legal determination of who will assume the position of Chief Justice on February 1, 2013,

IT IS HEREBY ORDERED THAT

Any sitting Justice interested in a legal determination of this matter may file with the Clerk of Court, no later than July 31, 2012, on the following issue:

In consideration of Chief Justice Catherine D. Kimball's retirement on January 31, 2013, for purposes of determining who is Chief Justice of the Louisiana Supreme Court as of February 1, 2013, which Justice is the "judge oldest in point of service on the

---

thermore, the amendment to the Consent Judgment in 2000 incorporated the entirety of Act 776 into the Consent Judgment, not the West version of the statute amended by the Act.

**26.** *Across the USA: News from Every State,* USA TODAY, November 17, 1994, at A12.

**27.** After Justice Ortique's retirement from the *Chisom* seat, a special election was held to fill the position. Then–Fourth Circuit Court of Appeals Judge Miriam Waltzer and then-Orleans Civil District Court Judge Johnson came in first and second, respectively, in the Octo-ber 1, 1994 primary election. However, Judge Waltzer withdrew from the race on October 7, 1994, and Justice Johnson was declared the winner. *See* Frank Donze, *Waltzer Drops Out, Hands Seat to Johnson,* NEW ORLEANS TIMES-PICAYUNE, October 8, 1994, at A1. As a result, Justice Johnson was sworn in on November 16, 1994.

**28.** *See Louisiana Supreme Court Justices: Justice Jeannette Theriot Knoll,* LOUISIANA SUPREME COURT WEBSITE, http://www.lasc.org/justices/knoll.asp (last visited August 23, 2012).

supreme court" under Article V, Section 6 of the Louisiana Constitution of 1974?

Factual matters, if any, shall be submitted by affidavit filed with the Clerk of Court no later than July 31, 2012. Any responses by a sitting Justice shall be filed with the Clerk of Court by August 15, 2012. This matter shall be assigned for written opinion.

*In re Office of Chief Justice, La. Supreme Court,* 12-O-1342 (La.6/13/12), 98 So.3d 264 ("June 13, 2012 Order").

## II. THE PENDING MOTIONS

With this history in mind, the Court now turns to the pending motions. On July 5, 2012, Justice Johnson filed a pleading in this Court seeking to reopen this case, seeking to enjoin the Supreme Court from proceeding in any way under its June 13, 2012 Order, seeking to join certain individual justices of the Supreme Court as defendants, seeking to hold those individual justices in contempt, seeking a declaratory judgment from this Court that she is the rightful successor to the position of Chief Justice of the Supreme Court, and seeking costs and attorneys' fees.[29] On July 10, 2012, the *Chisom* Plaintiffs [30] filed a pleading [31] in this Court, seeking essentially the same relief as Justice Johnson. On July 18, 2012, the *Chisom* Plaintiffs and Justice Johnson filed a joint motion asking this Court to stay the proceedings underway in the Supreme Court until the Court has ruled on the motions to reopen the case.[32] On July 20, 2012, the Supreme Court amended its June 13, 2012 Order, extending the deadlines in that Order by one month, to August 31, 2012, and September 15, 2012, respectively.[33] Also on July 23, 2012, this Court issued a briefing schedule, leading up to an oral argument date of August 16, 2012.[34] On July 27, 2012, the United States filed a pleading in support of the motions filed by Justice Johnson and the *Chisom* Plaintiffs.[35]

On August 13, 2012, counsel representing the State, through the Office of Governor, and Governor Jindal, filed a motion to dismiss the motions filed by Justice Johnson and the *Chisom* Plaintiffs, arguing that, *inter alia,* this Court lacks jurisdiction, that the *Chisom* Plaintiffs are without standing to bring their claims, and that, even if this Court does have standing, it should abstain and defer to the State.[36] The State also filed memoranda opposing the motions filed by the *Chisom* Plaintiffs and Justice Johnson that same day.[37] On August 14, 2012, the NAACP was granted leave to file an amicus curiae brief in support of the pleadings filed by Justice Johnson and the *Chisom* Plaintiffs.[38]

On August 14, 2012, the *Chisom* Plaintiffs filed an opposition to the State's mo-

---

**29.** R. Doc. 137.

**30.** Only three of the original six named plaintiffs in this case are still actively participating. Counsel for the *Chisom* Plaintiffs has explained to the Court that Henry Dillon and Walter Willard do not wish to participate, and that the Louisiana Voter Registration/Education Crusade no longer exists.

**31.** R. Doc. 146.

**32.** R. Doc. 159.

**33.** *See In re: Office of Chief Justice, Louisiana Supreme Court,* 12-O-1342 (La.7/20/12), http://www.lasc.org/news_releases/2012/2012-043.asp.

**34.** R. Doc. 166.

**35.** R. Doc. 183.

**36.** *See* R. Doc. 197.

**37.** *See* R. Doc. 200; R. Doc. 202.

**38.** R. Doc. 206.

tion to dismiss.[39] On August 14, 2012, the United States filed an opposition to the State's motion to dismiss, asserting that principles of abstention are inappropriate in cases in which the federal government is a plaintiff or plaintiff-intervenor.[40] Justice Johnson also filed an opposition to the motion to dismiss,[41] addressing all of the arguments raised in the State's motion, as well as reply memoranda in further support of her motion to reopen[42] and her motion to stay.[43]

On August 16, 2012, the City of New Orleans was granted leave to file an amicus curiae brief in support of the pleadings filed by Justice Johnson and the *Chisom* Plaintiffs.[44]

On August 16, 2012, this Court heard oral argument on all pending motions.[45]

### III. JURISDICTION OF THE COURT

■ The first issue the Court must address is whether it has continuing jurisdiction to consider the motions filed by Justice Johnson and the *Chisom* Plaintiffs even though the Consent Judgment was approved in 1992, and approved as amended on January 3, 2000, more than twelve years ago, and the case may have been administratively "closed" at some point between then and now. When asked at oral argument, the State did not deny that it is bound by the terms of the Consent Judgment, including the January 3, 2000 Order

that added the language of Act 776 as an addendum,[46] but instead argued that this Court lacks jurisdiction to consider the motions filed by Justice Johnson and the *Chisom* Plaintiffs. The State contends that the Consent Judgment explicitly limits the Court's jurisdiction over this case by providing that the Court "shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished,"[47] and that complete implementation was accomplished on October 7, 2000 when Justice Johnson was elected to the Supreme Court from the Seventh Supreme Court District.[48] The State also points out that the provision quoted above regarding the Court's retained jurisdiction until complete implementation of the final remedy was not included in the 2000 amendment to the Consent Judgment, and that this serves as an indication that the Court did not intend to retain jurisdiction after that point.

Justice Johnson, the *Chisom* Plaintiffs, and the United States argue that the "final remedy" under the Consent Judgment has not been achieved, contending that the Consent Judgment called not only for the creation of a new Supreme Court District, but also for the justice sitting in the seat created by the Consent Judgment to be considered equal in all respects to the other justices of the Supreme Court, including seniority and tenure.[49] Because an

---

**39.** R. Doc. 207.

**40.** R. Doc. 209.

**41.** R. Doc. 210.

**42.** R. Doc. 212.

**43.** R. Doc. 211.

**44.** R. Doc. 216.

**45.** R. Doc. 217.

**46.** *See* R. Doc. 221 (Motion Hr'g Tr. 34:10–16 Aug. 16, 2012).

**47.** *See* R. Doc. 120 (Consent Judgment).

**48.** *See* R. Doc. 197 (State's Motion to Dismiss).

**49.** *See, e.g.* R. Doc. 210–212 (Justice Johnson's opposition to the State's motion to dismiss and her reply memoranda in further support of her earlier filed motions).

issue has arisen as to which justice will succeed Justice Kimball upon her retirement, and because the resolution of that issue hinges on seniority and tenure, they argue that the final remedy of the Consent Judgment has not yet been accomplished.

The motions filed by Justice Johnson and the *Chisom* Plaintiffs request that the Court "reopen" this case. In reality, this case has not been "closed," except perhaps administratively, which has no legal meaning or effect. This Court will consider the motions filed by Justice Johnson and the *Chisom* Plaintiffs as motions to interpret the terms of the Consent Judgment. *See Armstrong v. Capshaw, Goss & Bowers, LLP,* 404 F.3d 933, 936 (5th Cir.2005) (citing *Edwards v. City of Houston,* 78 F.3d 983, 995 (5th Cir.1996) (en banc) ("We have oft stated that the relief sought, that to be granted, or within the power of the Court to grant, should be determined by substance, not a label.")). As thus framed, the question remains whether this Court has continuing jurisdiction to interpret the terms of the Consent Judgment.

█ It is well-settled that a federal court has the inherent authority to enforce its own orders, including consent decrees agreed to by parties and approved by the Court. *See, e.g. United States v. Alcoa, Inc.,* 533 F.3d 278, 287 (5th Cir.2008). Indeed, "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew v. Hawkins,* 540 U.S. 431, 440, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). "Once approved, the prospective provisions of the consent decree operate as an injunction." *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir. 1983) (citing *Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir.1982); *Carson v. Am. Brands,* 450 U.S. 79, 84 n. 9, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981); *United States*

*v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981) (en banc)).

The U.S. Court of Appeals for the Ninth Circuit has explained why a consent decree is considered to be in the nature of an injunction:

> A judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction. Consent decrees differ from contested injunctions in that, instead of being won in contested litigation, they are issued by the court pursuant to an agreement of the parties. A consent decree is therefore "in some respects contractual in nature," but the equitable decree based on the agreement "is subject to the rules generally applicable to other judgments and decrees."

*Gates v. Shinn,* 98 F.3d 463, 468 (9th Cir.1996) (internal citations omitted); *see also Smyth v. Rivero,* 282 F.3d 268, 280 (4th Cir.2002) ("[T]he consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effects."). As the U.S. Court of Appeals for the Sixth Circuit in *Vukovich* has explained: "The injunctive quality of consent decrees compels the court to: 1) retain jurisdiction over the decree during the term of its existence ... 2) protect the integrity of the decree with its contempt powers; ... and 3) modify the decree should 'changed circumstances' subvert its intended purpose." *Id.* (internal citations omitted).

█ So long as the final remedy under a consent decree has not been achieved, the court entering the decree retains subject matter jurisdiction to interpret and enforce the decree's terms. *See, e.g., Nehmer v. U.S. Dept. of Veterans Affairs,* 494 F.3d 846, 856 (9th Cir.2007).

The court entering the consent judgment is also the tribunal with the power to determine whether it has been fully complied with and should be dissolved or vacated. *See, e.g., Bd. of Educ. of Okla. City Pub. Schs. v. Dowell,* 498 U.S. 237, 247–50, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (stating that a district court's clear, affirmative ruling that the consent decree is no longer necessary in its current form is required for the parties to it to no longer be bound by it); *see also Frew,* 540 U.S. at 442, 124 S.Ct. 899 (2004). Exactly how a court should enforce and protect its orders is an issue largely left to the discretion of the court entering the order, so long as that discretion is exercised reasonably.

■ There has been no affirmative ruling by this Court that the Consent Judgment has been completely satisfied and thus has been vacated or terminated, nor has there been any request that this be done. Because the Court finds that the "final remedy" under the Consent Judgment has not yet been accomplished, the Court has continuing jurisdiction and power to interpret the Consent Judgment as requested by Justice Johnson and the *Chisom* Plaintiffs. The explicit terms of the Consent Judgement provide the Court continuing jurisdiction over this dispute, stating that the Court "shall retain jurisdiction over this matter until the complete implementation of the final remedy has been accomplished." [50] While it is true "that district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees," and are "instead constrained by the terms of the decree and related order," *Pigford v. Veneman,* 292 F.3d 918, 924 (D.C.Cir.2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 381, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)), the very terms of the Consent Judgment in this case provide the Court with a suffi-

cient jurisdictional basis to resolve the dispute pending before it. This is true after the 2000 amendment to the Consent Judgment, even though the amendment did not include this same "continuing jurisdiction" language. The amendment did not replace the terms of the original Consent Judgment, but instead supplemented them.

Because, as will be explained in the pages to follow, the Court finds that the Consent Judgment calls for Justice Johnson's tenure from November 16, 1994, until October 7, 2000, to be credited to her for all purposes under Louisiana law, the Court finds that the "final remedy" in the Consent Judgment has not yet been implemented. By law and by the terms of the Consent Judgment, this Court expressly retains jurisdiction over this case until that final remedy is implemented. This Order is an exercise of the Court's discretion to enforce and protect its orders. *See Vukovich,* 720 F.2d at 920.

## IV. Interpretation of the Consent Judgment

■ The Court now turns to the question before it: whether the Consent Judgment covers the issue of the seniority and tenure of Justice Johnson for all purposes under Louisiana law. To interpret the Consent Judgment, the Court must consider the actual terms of the Consent Judgment, as originally entered on August 21, 1992, and as amended on January 3, 2000.

■ Consent decrees are generally referred to as being "hybrids" of contracts and judicial decrees. In *Frew,* the U.S. Supreme Court explained the hybrid nature of consent decrees:

Consent decrees have elements of both contracts and judicial decrees. *Firefighters v. Cleveland,* 478 U.S. 501, 519,

---

**50.** R. Doc. 120.

106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

540 U.S. at 437, 124 S.Ct. 899; *see also United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 235–237, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *Armour & Co.*, 402 U.S. at 681–82, 91 S.Ct. 1752; *Vukovich*, 720 F.2d at 920; *City of Miami*, 664 F.2d at 439–40. Indeed, the significance of a consent decree's hybrid status as contract and order is that the decree is interpreted like a contract but enforced like a judicial order. *Alcoa*, 533 F.3d at 288 & n. 32.

Because of this hybrid nature, the Fifth Circuit has held, in numerous contexts, that in interpreting a consent decree, the Court should apply basic rules of contract interpretation and construction, while also keeping in mind that the decree functions as an enforceable judicial order. *See, e.g.*, *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir.1998) (Comprehensive Environmental Response, Compensation, and Liability Act); *Dean v. City of Shreveport*, 438 F.3d 448, 460–61 (5th Cir.2006) (employment discrimination); *Ruiz v. Estelle*, 161 F.3d 814, 822–23 (5th Cir.1998) (Prisoner Litigation Reform Act); *Alcoa*, 533 F.3d at 288 (Clean Air Act); *United States v. City of Jackson, Miss.*, 359 F.3d 727, 732 (5th Cir.2004) (Fair Housing Amendments Act); *City of El Paso, Tex. v. El Paso Entertainment, Inc.*, 464 Fed.Appx. 366, 372 (5th Cir.2012) (unpublished) (municipal zoning).

██ While this Court's research has not revealed a Fifth Circuit case in which a court specifically says that a consent decree entered in a Voting Rights Act case is to be construed and interpreted as a contract, courts in other circuits have done so. *See, e.g. Derrickson v. City of Danville, Ill.*, 845 F.2d 715, 718 (7th Cir.1988) ("[A] consent decree is fundamentally a contract and therefore does not bind a governmental body to any greater degree than a contract."); *Cleveland Cnty. Ass'n for Gov't by People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 477 (D.C.Cir.1998) ("[T]he consent decree in this case specifically provides that no violation of the Voting Rights Act is to be inferred, and the Supreme Court has specifically held that consent decrees should be construed simply as contracts, without reference to the legislation that motivated the plaintiffs to bring suit."); *Perry–Bey v. City of Norfolk, Va.*, 678 F.Supp.2d 348, 381 (E.D.Va. 2009) ("When construing a consent decree, courts are guided by principles of contract interpretation and, where possible, will discern the parties' intent from the unambiguous terms of the written consent decree, read as a whole.") (citing *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958 (8th Cir.2002)). The Court knows of no reason why the Fifth Circuit would not follow this rule of interpretation as well. As a result, the Court will interpret the Consent Judgement using the rules of contract interpretation, keeping in mind that the Consent Judgment is also a judicial decree.

██ As with any contract, the interpretation begins with looking to the "four corners" of the decree. *Dean*, 438 F.3d at 448 (citing *Chromalloy*, 158 F.3d at 350). When a contract is expressed in unambiguous language, its terms will be given their plain meaning, and enforced as written. *Chromalloy*, 158 F.3d at 350 (internal citation omitted). Likewise, "[t]he entry of a consent decree necessarily im-

plies that the litigants have assented to all of its significant provisions," *City of Miami,* 664 F.2d at 440, and the Court must "honor the presumption that parties to a contract intend every clause to have some effect." *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 377 (5th Cir.2002) (internal citation omitted).

Under Louisiana's contract interpretation rules, "the Court is to determine the parties' common intent as reflected by the words of the contract." *In re Cudd Pressure Control, Inc.,* 109 F.Supp.2d 486, 493 (E.D.La.2000); LA. CIV.CODE ANN. art. 2045. "Such intent is to be determined in accordance with the general, ordinary meaning of the language used in the policy, unless the language used has acquired a technical meaning." *Id.; see also* LA. CIV.CODE ANN. art. 2047. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV.CODE ANN. art. 2046.

Only if the terms of the decree are ambiguous will the Court look outside of the four corners of the decree to interpret it. A decree "is ambiguous when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction." *Dean,* 438 F.3d at 460–61. A contract is not ambiguous when only one of two competing interpretations is reasonable, or merely because one party can create a dispute in hindsight. *See Tex. E. Transmission Corp. v. Amerada Hess Corp.,* 145 F.3d 737, 741 (5th Cir.1998) (internal citations omitted). Likewise, a contract is not ambiguous simply because the parties disagree upon the contract's correct interpretation. *D.E.W., Inc. v. Local 93, Laborer's Intern. Union of N. Am.,* 957 F.2d 196, 199 (5th Cir.1992); *see also*

*Succession of Fannaly v. Lafayett Ins. Co.,* No. 01–1355 (La.1/15/02), 805 So.2d 1134 ("[T]he rules of contractual interpretation 'do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists.' ") (internal citation omitted).

Louisiana law also dictates interpreting contract provisions that are susceptible to different meanings in such a way to avoid neutralizing any of those provisions. *See Tex. E. Transmission Corp.,* 145 F.3d at 741–42; *see also* LA. CIV.CODE ANN. art. 2049. Louisiana Civil Code article 2048 provides: "[w]ords susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." Louisiana Civil Code article 2050 provides: "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."

The Court turns now to the four corners of the Consent Judgment to determine whether or not it is ambiguous with respect to tenure and seniority. The Consent Judgment, as entered into in August 1992, states that "the Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall receive the same compensation, benefits, expenses, and emoluments of offices as now or hereafter are provided by law for a justice of the Supreme Court." It provides further that "the Fourth Circuit Court of Appeal Judge assigned to serve on the Supreme Court shall participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court," and that "[t]he assigned judge and the seven Supreme Court justices shall participate fully and share equally in all other duties and powers of the Supreme Court, including, but not limited to, those powers set forth by the

Louisiana Constitution, the laws of Louisiana, and the Louisiana Rules of Court."

The two key words are "emoluments" and "equally." Black's Law Dictionary defines the term "emolument" as "any advantage, profit, or gain received as a result of one's employment or one's holding of office." BLACK'S LAW DICTIONARY 601 (9th ed.2009). Justice Johnson and the *Chisom* Plaintiffs argue that tenure and seniority should be included in the definition of emolument. Likewise, Justice Johnson and the *Chisom* Plaintiffs argue that it would be an assault on the term "equally" to hold that Justice Johnson's tenure could be equal to the other justices for some purposes but not for others. The State does not take a position.

The term emoluments as used in the Consent Judgment may be ambiguous and fairly susceptible to multiple interpretations. *Dean*, 438 F.3d at 460–61. While the issue of tenure and seniority may be considered an advantage or gain received from public office, reasonable persons could disagree, and Justice Johnson conceded at oral argument that the term is less than clear. Normally, the Court would be required to attempt to ascertain the intent of the parties to the Consent Judgment and to determine whether the inclusion of the term emoluments was meant to cover the issue of tenure and seniority for all purposes. In that analysis, the Court would consider the language of the pleadings leading up to the entry of the Consent Judgment, the legislative history of Act 512, and any other extrinsic evidence relevant to the issue of the parties' intent. Indeed, the parties have submitted to the Court limited extrinsic evidence, but for the reasons expressed below, the consideration of this evidence was not necessary for the Court's decision. This is because in the year 2000, the parties to the Consent Judgment agreed to, and Judge Schwartz approved, an amendment of the Consent Judgment that obviates the need for such an endeavor.

In December 1999, the parties to the Consent Judgment, including the State through the Governor and the Attorney General, moved to add the entirety of Act 776 as an addendum to the Consent Judgment.[51] On January 3, 2000, Judge Schwartz granted the joint motion to amend the Consent Judgment by incorporating the provisions of Act 776.

Act 776 reads in pertinent part:

AN ACT to amend and reenact R.S. 13:101, 101.1, and 312.4(D), relative to the supreme court; to provide relative to redistricting the six supreme court districts into seven single member districts; to provide for the terms and assignment of the justices presently serving; to provide for the filling of vacancies; to remove provisions for a specific reapportionment of the supreme court; to provide with respect to the provisions for a temporary additional judgeship for the Court of Appeal for the Fourth Circuit and such judge's appointment to the supreme court; to provide for the term of office and compensation of such temporary judgeship; and to provide for related matters.

Be it enacted by the Legislature of Louisiana:

Section 1. R.S. 13: 101, 101.1, and 312.4(D) are hereby amended and reenacted to read as follows:

· · ·

§ 312.4. Fourth circuit; temporary additional judgeship; election; composition

---

**51.** *See* R. Doc. 135.

D. The judgeship provided for in Subsection A shall expire automatically on the date that a justice of the supreme court takes office after being elected in a special election called for the office of justice of the supreme court which is held in District 7, as provided in R.S. 13:101(D) or from the date that a justice takes office after being elected in the regular supreme court election held in the year 2000 from District 7 whichever occurs first.

Section 2.(A) The judge elected to the temporary additional judgeship established by the provisions of R.S. 13:312.4 shall continue to receive the same compensation and benefits as provided in R.S. 13:312.4(C) until the judgeship expires.

(B) The temporary additional judgeship established by the provisions of R.S. 13:312.4 shall be abolished when the term of office of the judge elected to such temporary additional judgeship expires as provided in R.S. 13:312.4(D). **Any tenure on the supreme court gained by such judge while so assigned to the supreme court shall be credited to such judge.**

Section 3.(A) The precincts enumerated in Section 1 of this Act are the precincts existing as of April 1, 1997, established by the governing authority of each parish in conformity with R.S. 18:532 which requires their establishment; however, in cases in which a precinct established by the parish governing authority includes a discontiguous geographical area which has been given an alphabetical designation in addition to the numerical designation for the purpose of convenience and clarity in taking and reporting the census counts by the United States Bureau of the Census, these designations are also enumerated in this Act for the purpose of clarity. The assignment of a precinct in this Act shall include all

discontiguous alphabetical portions of the precinct regardless of where the enumeration of that discontiguous portion is listed unless otherwise specifically provided in this Act.

(B) With respect to any precinct referenced in this Act that has been subdivided by action of any parish governing authority or registrar of voters on a nongeographic basis, the reference in this Act to a precinct shall be construed to include all polling subdivisions thereof irrespective of the creation of such subdivision by a parish governing authority or registrar of voters.

Section 4. This Act shall become effective on January 1, 1999, and shall not affect any election held prior to that date, except that if and when a vacancy occurs prior to January 1, 1999, in the office of either justice of the first supreme court district as now constituted, the provisions of R.S. 13:101 (District 1) and (District 7) and 101.1(D) shall become effective immediately upon the occurrence of the vacancy.

1997 La. Sess. Law Serv. Act 776 (H.B. 581) (emphasis added).

With the addition of the emphasized provision of Act 776, the terms of the Consent Judgment with regard to the issue of tenure become clear and unambiguous. The Consent Judgment, as amended, provides that "tenure on the supreme court gained by [the *Chisom* Judge] while so assigned to the supreme court shall be credited to such judge." As a result, the Court finds that the Consent Judgment provides that Justice Johnson's service from November 16, 1994, to October 7, 2000, shall be credited to her for all purposes under Louisiana law, including for the purpose of determining seniority.

As explained above, "[t]he entry of a consent decree necessarily implies that the

litigants have assented to all of its significant provisions," *City of Miami,* 664 F.2d at 440, and the Court must "honor the presumption that parties to a contract intend every clause to have some effect." *Baton Rouge Oil,* 289 F.3d at 377. The provisions of Act 776 are now part of the Consent Judgment, binding on the State to the same extent as the original Consent Judgment. The State assented to the inclusion of Act 776 as an addendum to the Consent Judgment, and the State is presumed to have intended the consequences of its own actions.

The State argues that, consistent with standard rules of contract interpretation, this Court must also consider the provision of Act 776 providing that it shall not affect any election held prior to January 1, 1999. The State argues, in the context of the Consent Judgment, that this provision of Act 776 means the tenure provision cannot apply to Justice Johnson's time served on the Supreme Court prior to January 1, 1999, because those years were the result of an election held prior to January 1, 1999. This argument would ignore the tenure provisions of the Consent Judgment, which goes against well-settled principles of contract interpretation. *See Tex. E. Transmission Corp.,* 145 F.3d at 741–42 (Under Louisiana law, "[c]ontract provisions susceptible to different meanings should be interpreted to avoid neutralizing or ignoring any of them or treating them as surplusage.") (internal citation omitted); *see also* LA. CIV.CODE ANN. art. 2049 ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.").

Ordinarily, a Court faced with interpreting a consent decree considers the terms of the agreement and construes it as a contract without needing to go any further. However, because the 2000 amendment to the Consent Judgment incorporates Act 776 in its entirety, the Court will also discuss the State's principles of statutory interpretation to demonstrate that the same result is obtained. The Supreme Court explained, in *Richard v. Hall,* the State's approach to statutory interpretation:

When a law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. The meaning and intent of a law are determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker in enacting it. The statute must therefore be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the legislature had in enacting it. This is because the rules of statutory construction require that the general intent and fair purpose of the legislature in enacting the law must, if possible, be given effect. Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. Furthermore, the object of the court in construing a statute is to ascertain the legislative intent and, where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result. It is presumed the intention of the legislative branch is to achieve a consistent body of law.

No. 03–1488 (La.4/23/04), 874 So.2d 131, 148 (internal citations and quotations omitted); *see also Stead v. Swanner,* No. 10–371 (La.App. 5 Cir. 12/28/10), 52 So.3d

1149, 1152 (Under Louisiana law, "[w]here it is possible, the courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions.").

Just as with the principles of contract interpretation, the Court must, using principles of statutory interpretation, strive to give meaning to all parts of a statute without making any part superfluous or meaningless. To ascertain the meaning of the effective date provision in this context, this Court must first ascertain the legislative intent behind the Act. In doing so, the Court considers the legislative history behind the Act.

On May 28, 1997, the Louisiana State Senate Committee on Senate and Governmental Affairs discussed House Bills Number 580 and Number 581.[52] House Bill Number 580 was a proposed constitutional amendment that ultimately proved unsuccessful, while House Bill Number 581 was signed into law as Act 776. During this meeting, the senators discussed the bills in general, and specifically the effective date provision in House Bill Number 581, in light of the fact that the reapportionment of the Supreme Court Districts was to happen a year earlier than originally contemplated by the Consent Judgment (i.e., in 1997 instead of 1998), the pendency of *Perschall* in the Supreme Court, and the fact that two of the justices of the Supreme Court were up for re-election in 1998. The minutes of this May 28, 1997 meeting clear up any confusion as to which part or parts of the Act the effective date provision was meant to apply.

During a discussion between Senator Jay Dardenne and Glenn Koepp ("Mr. Koepp"), then-Assistant Secretary of the Senate and Director of the Legislative Bureau, Senator Dardenne made it clear that the provision regarding elections prior to January 1, 1999, was inserted to protect Justice Pascal Calogero and Justice Kimball, both of whom were up for re-election in 1998, by ensuring that they ran in their historical districts and not their districts after reapportionment.[53] The senators at the hearing were clearly concerned that Act 776 be crafted in a way that it could be signed into law in 1997 but still protect the status quo and allow Justices Kimball and Calogero to run from their then-constituted districts in the 1998 election, before the Act's provisions regarding reapportionment, which called for sitting Justices to be assigned to one of the now seven Supreme Court Districts, would take effect. It is clear to the Court that the effective date provision was not inserted into the Act to neutralize the provision that tenure shall be credited to the judge elected under the Consent Judgment. As explained by the Supreme Court in *Richard*, statutes must be "applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the legislature had in enacting it," and that "it is presumed the intention of the legislative branch is to achieve a consistent body of law." 874 So.2d at 148. Courts are

52. Minutes, Louisiana State Senate, Committee on Senate and Governmental Affairs (May 28, 1997).

53. *Id.* at 21 (Senator Dardenne explained: "the fact that we're making this effective 1–1–99 and not affecting any election held prior to the date means that under the consent decree and the existing elections that are scheduled, those will happen prior to 1–1–99 and therefore they're going to take place under those existing lines."); *see also id.* at 16 (explaining what would happen if the effective date provision was not inserted, Mr. Koepp explained that the bill "forces the two Justices that have to run whose terms expire in '98, and that's Justice Kimball and Justice Calogero, will have to run in districts created under this bill instead of running under their present districts.").

warned not to read statutes in the manner suggested by the State. This Court will not interpret Act 776 in a way that ignores the obvious intent of the legislators and the spirit of the Act. *See id.*

The minutes from this May 28, 1997 meeting also shed light on the tenure provision in Act 776. At the time House Bill Number 581 was being discussed, the Supreme Court had not yet ruled in *Perschall*, and it was unclear how the Supreme Court would rule in that case. However, Mr. Koepp explained that the tenure provision was inserted to protect Justice Johnson in the event that her position was invalidated by the Supreme Court, by providing that "the bill further guarantees that [Justice Johnson] gets the emoluments of office, the time served, credit for time served and whatever else." [54]

## V. Standing

█ The State questions whether the *Chisom* Plaintiffs have standing to participate in this dispute. There is no merit to the State's position. The *Chisom* Plaintiffs litigated this case for six years before the Consent Judgment was signed, and counsel for these plaintiffs signed both the 1992 Consent Judgment and the 2000 amendment. Indeed, it is the *Chisom* Plaintiffs who initiated this suit in the first place, on behalf of registered Black voters in Orleans Parish. The State would have this Court believe that the issue now before the Court affects only Justice Johnson personally, as she is the individual who stands to win or lose the position of Chief Justice and that, as a result, the *Chisom* Plaintiffs lack standing. However, this ignores the role the other plaintiffs played in the creation of the Consent Judgment, which is, for all intents and purposes, a binding contract. To say that a party to a contract lacks standing to enforce the contract's terms is to ignore extremely well-settled law to the contrary.

## VI. Abstention

█ The Court has held that it has continuing jurisdiction over the matters raised in the motions filed by Justice Johnson and the *Chisom* Plaintiffs, has held that the *Chisom* Plaintiffs have standing, and has ruled on the main relief requested, the interpretation of the terms of the Consent Judgment as amended in 2000. The Court will now address the State's argument that, even if this Court has jurisdiction, it should abstain from ruling in favor of allowing the Supreme Court to proceed as envisioned in its June 13, 2012 Order. "The term abstention refers to judicially created rules whereby federal courts may not decide some matters before them even though all jurisdictional and justiciability requirements are met." ERWIN CHEMERINSKY, FEDERAL JURISDICTION 811 (6th ed.2012). The Court recognizes that the power of the federal courts is a limited one, and that doctrines of abstention are grounded in rules of comity and federalism, created to prevent unnecessary intrusion by the federal court into a state's power to hear and decide state law issues. However, none of the abstention doctrines cited by the State applies in this case.

### A. *Younger* Abstention

█ The State seeks to have this Court abstain from ruling on this issue under the *Younger* abstention doctrine. Under *Younger* abstention, a federal court must decline to interfere with a pending state civil or criminal proceeding when important state interests are involved. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION

---

54. *Id.* at 21.

847–852 (6th ed.2012). The *Younger* doctrine provides that three conditions must be met before the federal court is required to abstain and decline jurisdiction: "(1) the federal proceeding would interfere with an 'ongoing state judicial proceeding'; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has 'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *Bice v. La. Pub. Defender Bd.*, 677 F.3d 712, 716 (5th Cir. 2012) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)); *see also Younger*, 401 U.S. 37, 91 S.Ct. 746. The Court finds that the first requirement for *Younger* abstention is not met in this case, so there is no need to address the remaining two requirements.

█ The first *Younger* requirement is that there be an ongoing state judicial proceeding with which the federal proceeding would interfere. The judicial branch of the State's government is established in Article V of the Louisiana Constitution of 1974. The State's judicial power "is vested in a supreme court, courts of appeal, district courts, and other courts authorized by this article." LA. CONST. art. 5, § 1. The Supreme Court is granted original jurisdiction only over issues related to attorney discipline. LA. CONST. art. 5, § 5(B).[55] The Supreme Court is granted appellate jurisdiction over all issues in civil cases properly before it, LA. CONST. art. 5, § 5(F), but its appellate jurisdiction extends only to cases and controversies arising in the district courts. The district courts have orig-

inal jurisdiction over all civil and criminal matters, other than attorney discipline. LA. CONST. art. 5, § 16(A). Not only must a court have jurisdiction to hear a particular case, the Supreme Court has clearly and repeatedly stated that, "[p]art and parcel of the state judiciary's exercise of judicial power is the threshold requirement of a dispute, in the sense that adverse parties with opposing claims ripe for judicial determination are considered essential to the court's exercise of general jurisdiction." *Perschall*, 697 So.2d at 251 (citing *La. Indep. Auto Dealers Ass'n v. State*, 295 So.2d 796 (La.1974); *State v. Bd. of Supervisors*, 228 La. 951, 84 So.2d 597 (1955)). "It is well-settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies." *La. Associated Gen. Contractors, Inc. v. State*, 95–2105, p. 9 (La.3/8/96), 669 So.2d 1185, 1193. A justiciable controversy, with sufficient interest on behalf of the parties plaintiff and parties defendant, and sufficient adversity between the parties, is essential to avoid a court issuing a merely advisory opinion on a hypothetical or abstract set of facts. *Perschall*, 697 So.2d at 252.

The June 13, 2012 Order is not the result of an appeal of an action filed in the district court. Instead, the June 13, 2012 Order merely states that "contrary positions have been expressed on the issue of who will succeed to the office of Chief Justice upon the retirement of present Chief Justice Catherine D. Kimball on January 31, 2013," and that "the administration of justice requires a legal determina-

---

**55.** The Supreme Court also has general supervisory jurisdiction over all other courts and may establish procedural and administrative laws not in conflict with law for those courts. LA. CONST. art. 5, § 5(A). The issue addressed in the June 13, 2012 Order is not a procedural or administrative rule of the Su-

preme Court. Instead, the issue is addressed in the Louisiana Constitution of 1974. LA. CONST. art. 5, § 6. ("The judge oldest in point of service on the supreme court shall be chief justice. He is the chief administrative officer of the judicial system of the state, subject to rules adopted by the court.").

tion of who will assume the position of Chief Justice on February 1, 2013." The Supreme Court orders that "any sitting Justice interested in a legal determination of this matter may file with the Clerk of Court, no later than July 31, 2012" with respect to this issue.

Article V of the Louisiana Constitution does not grant the Supreme Court original jurisdiction when "contrary opinions have been expressed," even if those contrary opinions are expressed by associate justices of that court. As stated above, the Supreme Court has original jurisdiction only over issues related to attorney discipline and this is clearly not such an issue. La. Const. art. 5, § 5(B). The June 13, 2012 Order does not state which justices have expressed contrary opinions and what those contrary positions are. No justice has instituted a state judicial proceeding in the district court, which is the court of original jurisdiction for all civil matters other than attorney discipline. There is no party plaintiff and no party defendant before the Supreme Court and, as a result, there are no adverse parties to articulate the issues in dispute. As a result, the threshold requirement of a dispute, filed in a court of competent jurisdiction and between adverse parties with opposing claims ripe for judicial determination, has not been met. The Court finds that the first *Younger* requirement has not been satisfied in this case—there is no ongoing Louisiana state judicial proceeding—and as a result the Court will not exercise *Younger* abstention.[56]

■ Furthermore, *Younger* abstention is inapplicable to cases in which the federal government is a party. *See United States v. Composite State Bd. of Med. Exam'rs,*

656 F.2d 131, 135–36 (5th Cir.1981); *see also United States v. Commonwealth of Pa., Dep't of Envtl. Res.,* 923 F.2d 1071, 1078 (3d Cir.1991). The policy of avoiding conflicts between the state and federal courts is compelling in the case of private litigants. On the other hand, when the United States seeks relief against a state, the state and the federal government are already in direct conflict. In such a situation, any attempt to avoid a state and federal conflict by abstention is futile. It is the unnecessary conflict between state and federal systems that the principles of comity and federalism seek to avoid. *Composite,* 656 F.2d at 135–36. Furthermore, were the Court to agree with the State, the United States, an intervenor as a matter of right in this case and a party with a clear interest in the outcome of this case and the continued viability of similar consent decrees entered into in any number of other Voting Rights Act cases, would be left without any meaningful way to argue its position.

■ Alternatively, federal courts should refuse to abstain under *Younger* when "proceedings of substance on the merits have taken place in the federal court." *Midkiff,* 467 U.S. at 237–38, 104 S.Ct. 2321. *Younger* applies only to situations in which a state proceeding is instituted before the federal court gets a chance to address the issue. *Id.* The case now before the Court had seen more than two decades of "proceedings of substance" before the Supreme Court's June 13, 2012 Order was entered. The Consent Judgment, by law and by its terms, is a final judgment on the merits of the Voting Rights Act claims first raised in 1986. *See Alcoa,* 533 F.3d at 286 (citing *Ho v. Mar-*

---

**56.** *Younger* abstention has also been exercised in certain pending state court proceedings such as administrative proceedings and lawyer disciplinary proceedings that are judicial in nature. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).

*tin Marietta Corp.*, 845 F.2d 545, 547 (1988) ("[J]udicial consent decrees are not only final judgments on the merits, but also settlements to which adversarial parties have consented.")). The issue of the tenure to be credited to Justice Johnson was raised at least by the year 2000, if not before. There was no ongoing State judicial proceeding at the time this action was filed on September 19, 1986,[57] nor was there an ongoing State judicial proceeding when the Consent Judgment was entered on August 21, 1992[58] or when the Consent Judgment was amended on January 3, 2000.[59] Accordingly, the Court refuses to abstain under *Younger* because proceedings of substance on the merits took place in federal court years before the entry of the June 13, 2012 Order.

Finally, the State, in signing the Consent Judgment in 1996 and the amendment to the Consent Judgment in 2000, and thereby submitting to the continuing jurisdiction of this Court, has waived its right to argue for *Younger* abstention. *See Felder v. Estelle*, 693 F.2d 549, 553 (5th Cir.1982) (citing *Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 479, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977)). The final remedy in the Consent Judgment has not yet been implemented, and the Court continues to have jurisdiction over this case until that final remedy is achieved. The State has submitted to the continuing jurisdiction of this Court.

### B. *Pullman* Abstention

For the *Pullman* abstention doctrine to apply, two elements must be present: (1) a federal constitutional challenge to a state action, and (2) an unclear issue of state law, that, if resolved by the state court, would obviate the need for the federal court to rule on the federal consti-

tutional issue. *See Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm.*, 283 F.3d 650, 653 (5th Cir.2002). Under the *Pullman* abstention doctrine, a federal court should abstain from adjudicating the constitutionality of a state law "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (*quoting R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941)). Under *Pullman*, the federal court defers to the state court, giving it an opportunity to clarify the state law in a way that will make the federal court's constitutional ruling unnecessary.

"Unless the state law in question is fairly susceptible of an interpretation that might avoid or substantially modify the federal constitutional question, federal courts should exercise their properly invoked jurisdiction." *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 967 (5th Cir.1993) (quoting *O'Hair v. White*, 675 F.2d 680, 693 (5th Cir.1982) (en banc)). Indeed, "abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Midkiff*, 467 U.S. at 237, 104 S.Ct. 2321 (quoting *Zwickler v. Koota*, 389 U.S. 241, 251, and n. 14, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)).

The first requirement for *Pullman* abstention has not been met in this case. There has been no federal constitutional challenge to any state "action." A federal district court properly exercises *Pullman* abstention only in the face of a federal

---

**57.** *See* R. Doc. 1.

**58.** R. Doc. 120.

**59.** R. Doc. 135.

constitutional challenge to a state action, i.e., an unsettled issue of state law, filed in federal court. Federal decisions in which *Pullman* abstention has been exercised clearly involved the challenge, based on the federal constitution, of a state statute or state constitutional provision.[60] In this case, Justice Johnson and the *Chisom* Plaintiffs seek to have this Court interpret the Consent Judgment entered by a federal court under federal law. They do not challenge any Louisiana "action," statute, or state constitutional provision as violating the federal constitution. Accordingly, there is no federal challenge to a state court action.

The State makes much of Judge Schwartz's decision in the *Perschall* case to exercise *Pullman* abstention when faced with Clement Perschall's challenge to Act 512. *See Perschall v. State of La.*, No. 95–1265, 1995 WL 396311, at *2 (E.D.La. July 5, 1995). The State requests that this Court take a similar course of action. Perschall filed suit in the 19th Judicial District Court for the Parish of East Baton Rouge ("19th JDC"), seeking a declaratory judgment that Act 512 violated several provisions of the Louisiana Constitution as well as the 14th Amendment to the U.S. Constitution. The *Perschall* case was subsequently removed by the State from the 19th JDC to the U.S. District Court for the Middle District of Louisiana, and then transferred to the Eastern District. After the case was reallotted to Judge Schwartz, Judge Schwartz exercised *Pullman* abstention and remanded the case back to the 19th JDC for the state court to determine the constitutionality of Act 512. After several writ applications, the Supreme Court exercised its supervisory jurisdiction and granted certiorari to decide the merits of the case, bypassing the lower state courts from that point forward. 96–0322 (La.11/8/96), 1996 WL 659078, at *1.

In the *Perschall* case, Perschall questioned the constitutionality of Act 512 under both the Louisiana Constitution and the U.S. Constitution, and Judge Schwartz

---

60. *See, e.g. Pullman*, 312 U.S. at 501–02, 61 S.Ct. 643 (at issue in the federal court was whether the state railroad commission had authority under state law to issue a particular order; plaintiffs alleged that the state law violated the Equal Protection, Due Process, and Commerce Clauses of the U.S. Constitution); *Ibarra v. Bexar Cnty. Hosp. Dist.*, 624 F.2d 44, 47 (C.A.Tex.1980) (at issue in the federal court was the proper construction of the Texas constitution and a Texas statute; plaintiffs alleged the state laws violated Title VI of the Civil Rights Act of 1964, the Civil Rights Act of 1871, the Supremacy Clause of the U.S. Constitution, and the 14th Amendment to the U.S. Constitution); *Palmer v. Jackson*, 617 F.2d 424, 428–29 (5th Cir.1980) (at issue was the proper interpretation of the Texas constitution and certain Texas statutes regarding bar membership; plaintiffs alleged the state laws violated the 1st, 5th, and 14th Amendments to the U.S. Constitution). Other examples of uncertain issues of state law that called for abstention in the face of a federal constitutional challenge include: (1) the proper construction of a state statute regulating the practice of law which was alleged to violate the Contract Clause and the 1st and 14th Amendments to the U.S. Constitution, *Nationwide Mut. Ins. Co.*, 283 F.3d at 653–54; (2) whether a state statute applied prospectively, which was alleged to violate the U.S. Constitution's prohibitions against retroactive application of laws, *Nissan Motor Corp. v. Harding*, 739 F.2d 1005, 1010–11 (5th Cir.1984); (3) whether a provision of a state constitution, which was alleged to violate the 14th Amendment of the U.S. Constitution, created a property interest, *Mireles v. Crosby Cnty.*, 724 F.2d 431, 433 (5th Cir.1984); and (4) the proper construction of a state statute that could arguably be interpreted in a manner that would violate the 1st and 14th Amendments to the U.S. Constitution, *Pietzsch v. Mattox*, 719 F.2d 129, 131–32 (C.A.Tex.1983). The motions to interpret and enforce the Consent Judgment filed by Justice Johnson and the *Chisom* Plaintiffs do not include a federal constitutional challenge to any unsettled issue of state law.

abstained from deciding the state law issues in favor of allowing the state court to rule on those issues. In his order remanding the case, Judge Schwartz said that the constitutionality of Act 512 was a "novel" state law claim, and thus that the Supreme Court would be the more proper forum for litigating that issue. 1995 WL 396311, at *2. Judge Schwartz retained jurisdiction over Perschall's federal constitutional claim, but after the Supreme Court ruled that Act 512 was unconstitutional, Judge Schwartz determined that the federal claim was moot. *See Perschall v. State of La.,* No. 95–1265, 1997 WL 767703 (E.D.La. Dec. 10, 1997), *aff'd Perschall v. Louisiana,* 174 F.3d 197 (5th Cir.1999) (per curiam).

This case is different from *Perschall.* At the time Judge Schwartz exercised *Pullman* abstention, *Perschall* clearly presented a federal constitutional challenge in federal court to an unclear state law, and the *Pullman* requirements were met. In this case, there is no federal constitutional challenge to a state action. As a result, the requirements for *Pullman* abstention are not met. The *Chisom* Plaintiffs and Justice Johnson have asked this Court to interpret the Consent Judgment, not to interpret the Louisiana Constitution or to hold any state law unconstitutional under the U.S. Constitution. This Court has the authority to grant the relief sought by the plaintiffs, and *Pullman* abstention does not militate against the Court granting that relief. Further, because there is no federal challenge to a state action in this case, this Court's decision to decline abstention and interpret its own Order does not disregard the "rightful independence of the state governments." *Pullman,* 312 U.S. at 500, 61 S.Ct. 643.

■■■ Finally, a district court's decision whether to exercise *Pullman* abstention is discretionary. *Baran v. Port of Beau-*

*mont Navigation Dist. of Jefferson Cnty., Tex.* 57 F.3d 436, 440 & 440 n. 10 (5th Cir.1995) (citing *Am. Bank & Trust Co. of Opelousas v. Dent,* 982 F.2d 917, 922 (5th Cir.1993) ("Even if all the preconditions for abstention are present, the decision whether or not to abstain is generally one involving some exercise of discretion by the district court.")). The Fifth Circuit has recognized that "the extraordinary decision to stay federal adjudication requires more than an ambiguity in state law and a likelihood of avoiding constitutional adjudication. A district court must carefully assess the totality of the circumstances presented by a particular case. This requires a broad inquiry which should include consideration of the rights at stake and the costs of delay pending state court adjudication." *La. Debating & Literary Ass'n v. City of New Orleans,* 42 F.3d 1483, 1491 (5th Cir.1995) (quoting *Duncan v. Poythress,* 657 F.2d 691, 697 (5th Cir.1981)). The totality of the circumstances in this case include: (1) the fact that this action was filed in federal court and a final Consent Judgment was entered in 1992 and amended in 2000; (2) the fact that this Court has continuing jurisdiction to interpret the Consent Judgment because the final remedy has not been achieved; (3) the fact that no federal constitutional challenge to a state action has been filed in this Court; (4) the fact that there are no duplicative proceedings in state court; (5) the fact that the State did not raise *Pullman* abstention when this action was filed in 1986; and (6) the fact that the exercise of *Pullman* abstention would needlessly delay proceedings in this Court. Accordingly, the Court, in its discretion, declines to abstain from interpreting the Consent Judgment.

### C. *Burford, Colorado River,* and Equitable Abstention

■■■ The State has also asserted three other potential grounds for absten-

tion: *"Burford"* abstention,[61] *"Colorado River"* abstention,[62] and "equitable" abstention.[63] *Burford* abstention is applicable in cases involving a complex issue of unsettled state law that is better resolved through a state's regulatory scheme. 319 U.S. at 332, 63 S.Ct. 1098. In considering whether *Burford* abstention is appropriate, a district court considers the following five factors:

> (1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review.

*Moore v. State Farm Fire & Cas. Co.,* 556 F.3d 264, 272 (5th Cir.2009) (quoting *Wilson v. Valley Elec. Membership Corp.,* 8 F.3d 311, 314 (5th Cir.1993)). This case does not involve a complex state law being resolved through a Louisiana administrative proceeding with a special state forum. *Burford* abstention is not applicable to this case.

 Under the *Colorado River* doctrine of abstention, a federal court may, in its discretion, abstain from a case under "exceptional circumstances." *Brown v. Pacific Life Ins. Co.,* 462 F.3d 384, 394–95 (5th Cir.2006) (citing *Kelly Inv., Inc. v. Cont'l Common Corp.,* 315 F.3d 494, 497 (5th Cir.2002)). The Fifth Circuit has set forth the following six factors to consider in determining whether such "exceptional circumstances" exist:

> (1) [A]ssumption by either state or federal court over a res; (2) relative inconvenience of the fora; (3) avoidance of piecemeal litigation; (4) order in which jurisdiction was obtained by the concurrent fora; (5) extent federal law provides the rules of decision on the merits; and (6) adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

*Id.* at 395. "This doctrine only applies when there are parallel proceedings pending in federal and state court.... Suits are 'parallel' if they 'involve' the same parties and the same issues." *Id.* at n. 7. The State does not elaborate on the applicability of *Colorado River* abstention to this case, but it is clear to the Court that it does not apply, and this Court, in its discretion, declines to exercise *Colorado River* abstention. There are no parallel proceedings pending in federal and state court. Furthermore, there is no state court proceeding that will adequately protect the rights of the parties invoking this Court's jurisdiction.

 Finally, "equitable" abstention applies "when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). The State argues that Justice Johnson has an adequate remedy at law—the Supreme Court proceeding—and that this Court should abstain from ruling and leave Justice Johnson to make her case in that tribunal. The Court does not find that this would be an adequate remedy at law for Justice Johnson and the *Chisom* Plaintiffs because the relief they seek—the in-

---

**61.** *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

**62.** *See Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

**63.** R. Doc. 200.

terpretation of the Consent Judgment—is within this Court's continuing jurisdiction. It is true that the federalism concerns raised by the doctrine of equitable abstention "are heightened when . . . a federal court decree has the effect of dictating state or local *budget* priorities." *Horne v. Flores*, 557 U.S. 433, 448, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009) (emphasis added). However, the case now before the Court does not have budgetary ramifications.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River*, 424 U.S. at 813, 96 S.Ct. 1236. None of the abstention doctrines set forth by the State applies to this case. Accordingly, the Court will not abstain from interpreting the Consent Judgment.

## VII. Stay/Injunction

The plaintiffs' joint motion to stay sought to stay the Supreme Court proceeding until this Court ruled on its pending motions.[64] The Court has now ruled on the pending motions. The joint motion to stay is dismissed as moot.

Justice Johnson included in her motion filed on July 5, 2012, a request that the six justices of the Supreme Court, other than herself, be "restrained from proceeding under the June 13, 2012 Order, or otherwise from proceeding with the matter entitled *In re: Office of Chief Justice, Louisiana Supreme Court* and the process outlined in Justice Kimball's order, dated June 13, 2012 and/or acting in any way to deprive Justice Johnson of the position of the Chief Justice of the Louisiana Supreme Court."[65] Justice Johnson did not explicitly seek a temporary restraining order, or preliminary or permanent injunction under Rule 65 of the Federal Rules of Civil Procedure, did not ask the Court to set the amount of the security required for a temporary restraining order, and did not request that a hearing be set on her request for a "restraining" order.

The *Chisom* Plaintiffs requested in their motion filed on July 10, 2012 that the Court issue a temporary restraining order, and a preliminary and permanent injunction ordering the defendants to comply with the Consent Decree and staying all changes in the voting practices and procedures that affect the decision-making of the Supreme Court unless and until the Voting Section of the Department of Justice issues pre-clearance for these changes or defendants secure declaratory relief in the U.S. District Court for the District of Columbia.[66] The *Chisom* Plaintiffs did not request the Court to set the security required for a temporary restraining order and did not request a hearing on a preliminary or permanent injunction as required by Federal Rule of Civil Procedure 65. Neither Justice Johnson nor the *Chisom* Plaintiffs complied with the Rule 65 requirements for the issuance of a temporary restraining order or injunctive relief. As a result, the Court need not address whether the plaintiffs are entitled to such relief but, to the extent necessary, such requests are denied.

## VIII. The Anti–Injunction Act

The State argues that the Anti–Injunction Act, 28 U.S.C. § 2283, prevents this Court from issuing an order that will effectively enjoin the Supreme Court, while Justice Johnson argues that this situation is an exception to the Ant–Injunction Act. The United States argues that, as with *Younger* abstention, the Anti–Injunc-

---

64. R. Doc. 159.

65. R. Doc. 137.

66. R. Doc. 146.

tion Act is inappropriate in cases in which the federal government is a plaintiff or plaintiff-intervenor, because the goal of the Anti–Injunction Act is irrelevant in a case where the federal government's involvement in the case is in and of itself a source of the conflict.

The Anti–Injunction Act provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as authorized by Act of Congress, or where necessary in aid of it jurisdiction, or to protect or effectuate its judgment." The U.S. Supreme Court has held that the Anti–Injunction Act does not apply to actions brought by the United States to enjoin state proceedings. *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957).

The parties to this action have not seriously pursued the issuance of an injunction and, in any event, the Court will not issue an injunction at this time in response to the motions recently filed by Justice Johnson or the *Chisom* Plaintiffs.[67] Furthermore, the United States clearly is a party to this action. Finally, the State waived this argument by not raising it when this action was filed in 1986 or when the Consent Judgment was entered in 1992 and amended in 2000. For all of these reasons, the Court finds that the Anti–Injunction Act does not apply.

## IX. Joinder

█ The *Chisom* Plaintiffs and Justice Johnson seek to join the six individual justices of the Supreme Court, other than Justice Johnson, as involuntary defendants in this matter.[68] Rule 19(a)(1) of the Rules of Civil Procedure governs joinder of necessary and/or indispensable parties. Under this Rule, a person who is subject to service of process and under the jurisdiction of the Court must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed.R.Civ.P. 19(a)(1).

Justice Johnson argues that under Section (a)(1)(A) of Rule 19, Chief Justice Catherine Kimball and Justices Greg Guidry, Marcus Clark, John Weimer, Jeffrey Victory and Jeannette Knoll must be joined to accord her complete relief. The *Chisom* Plaintiffs seek to add these same justices as defendants, presumably on the same grounds. This Court will not join as defendants these six individual justices. These justices are not required as defendants in this action to accord complete relief to the existing parties in the case.

---

**67.** This does not change the fact that the prospective provisions of the 1992 Consent Judgment, as amended in 2000, operate as an injunction. *See Edwards*, 78 F.3d at 997. This Order merely clarifies the terms of the Consent Judgment, including those prospective provisions that are injunctive in nature. The Court is not issuing a new injunction against the Supreme Court or anyone else in

response to the pleadings recently filed by Justice Johnson and the *Chisom* Plaintiffs in this action. That said, by denying the requests for an injunction and/or stay directed at the Supreme Court, the Court is not lessening the injunctive effect of the Consent Judgment already in place as interpreted herein.

**68.** R. Docs. 137 and 146.

Justice Johnson's and the *Chisom* Plaintiffs' motions to reopen this case are being considered as motions to interpret the Consent Judgment, and this is what the Court has found that it has the jurisdiction to do. The Court need not add these six individual justices of the Supreme Court to grant that relief. The Court has the authority to interpret the Consent Judgment and that interpretation is binding on the parties to the agreement, including the State.[69] The Supreme Court, as an arm of the State, is bound by the terms of and this Court's interpretation of the Consent Judgment.

◼ Furthermore, without Justice Johnson or the *Chisom* Plaintiffs articulating a defined cause of action against the individual justices, the Court will not involuntarily join them as defendants in this case. *See Vieux Carre Prop. Owners, Residents & Assocs., Inc.,* 875 F.2d 453, 457 (5th Cir.1989); *cert. denied,* 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 739 (1990) ("It is implicit in Rule 19(a) itself that before a party ... will be joined as a defendant the plaintiff must have a cause of action against it.").[70]

The requests by the *Chisom* Plaintiffs and Justice Johnson to add Chief Justice Catherine Kimball and Justices Greg Guidry, Marcus Clark, John Weimer, Jeffrey Victory and Jeannette Knoll as defendants in this matter are denied.

## X. Contempt

◼ Justice Johnson asks the Court to hold Chief Justice Kimball, Justice Weimer, Justice Guidry and Justice Clark in contempt for violating the Consent Judgment. The *Chisom* Plaintiffs seek to hold the six individual justices, other than Justice Johnson, in contempt for holding secret meetings and making plans to violate the terms of the Consent Judgment.[71] While the Court is authorized to take necessary actions to preserve and enforce its orders, including the use of the Court's contempt power against non-parties, *see Hall,* 472 F.2d at 267–68, the decision regarding which steps are necessary is left to the discretion of the Court. *See Alcoa,* 533 F.3d at 287–88 (citing *Cook v. Ochsner Fdn. Hosp.,* 559 F.2d 270, 272 (5th Cir. 1977)). This Court does not find that the drastic remedy of contempt is appropriate in this case at this time. Accordingly, the motions of Justice Johnson and the *Chisom* Plaintiffs to hold Chief Justice Kimball, Justice Weimer, Justice Guidry, Justice Clark, Justice Victory and Justice Knoll in contempt of Court are denied.

## XI. Costs and Attorneys' Fees

Finally, Justice Johnson and the *Chisom* Plaintiffs request that they be awarded attorneys' fees and costs but do not support their request with law or facts. The Court has not been requested to, and did not award sanctions under, Rule 11 of the Federal Rules of Civil Procedure. Neither did the Court hold the individual justices of the Supreme Court in contempt. The Court finds no basis for the award of

---

**69.** *See Perschall,* 697 So.2d at 260.

**70.** The individual justices of the Supreme Court are precluded from taking any action contrary to the binding Consent Judgment, even if they are not named as defendants in this case. A consent decree is a binding court order, protectable by the Court that entered it, and enforceable by that Court against anyone seeking to violate it. *See, e.g., Waffen-*schmidt *v. MacKay,* 763 F.2d 711, 716–717 (5th Cir.1985) (citing *United States v. Hall,* 472 F.2d 261, 267–68 (5th Cir.1972); *Ex Parte Lennon,* 166 U.S. 548, 555, 17 S.Ct. 658, 41 L.Ed. 1110 (1897); *McGraw–Edison Co. v. Preformed Line Prods. Co.,* 362 F.2d 339, 344 (9th Cir.1966)).

**71.** R. Docs. 137 and 146.

attorneys' fees and costs. The motions of Justice Johnson and the *Chisom* Plaintiffs for attorneys' fees and costs are denied.

## CONCLUSION

Accordingly, **IT IS ORDERED** that Justice Johnson's and the *Chisom* Plaintiffs' motions to reopen are considered as motions to interpret the Consent Judgment and that those motions be and hereby are **GRANTED**.

**IT IS FURTHER ORDERED** that the Consent Judgment entered in this case on August 21, 1992, as amended on January 3, 2000, is interpreted to provide that any tenure accrued by Justice Johnson between November 16, 1994, and October 7, 2000, is to be credited to her for all purposes under Louisiana law.

**IT IS FURTHER ORDERED** that the State's motion to dismiss be and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that the *Chisom* Plaintiffs' and Justice Johnson's joint motion to stay be and hereby is **DISMISSED AS MOOT.**

**IT IS FURTHER ORDERED** that Justice Johnson's and the *Chisom* Plaintiffs' motions for involuntary joinder of the individual justices of the Supreme Court be and hereby are **DENIED.**

**IT IS FURTHER ORDERED** that Justice Johnson's and the *Chisom* Plaintiffs' motions for contempt against the individual justices be and hereby are **DENIED.**

**IT IS FURTHER ORDERED** that Justice Johnson's and the *Chisom* Plaintiffs' motions for attorneys' fees and costs are **DENIED.**

Justice Johnson moved to substitute the name of the current Governor of the State of Louisiana, Bobby Jindal, in place of Edwin Edwards, the Governor of the State at the time the suit was filed. On August 14, 2012, this Court ordered this substitution pursuant to Federal Rule of Civil Procedure 25(d).[72] Accordingly, **IT IS FURTHER ORDERED** that Justice Johnson's Motion to Substitute be and hereby is **DISMISSED AS MOOT.**

Justice Johnson has also moved to voluntarily dismiss certain official-capacity defendants from this case; namely, Jerry M. Fowler, the former Commissioner of Elections of the State of Louisiana, and James H. Brown, the former Secretary of the State of Louisiana. The Office of Commissioner of Elections as a statewide elected office was eliminated in 2004[73] and the functions were transferred to the Office of the Secretary of State. Accordingly, **IT IS FURTHER ORDERED** Justice Johnson's Motion for Voluntary Dismissal be and hereby is **GRANTED** with respect to the Commissioner of Elections, as the office no longer exists, and Jerry M. Fowler in his capacity as Commissioner of Elections for the State of Louisiana is **DISMISSED** as a defendant in this action.

The current Secretary of State Tom Schedler is the real party in interest in this case, and his name has been substituted as such pursuant to Federal Rule of Civil Procedure 25(d) by way of this Order. However, no opposition was filed with respect to Justice Johnson's motion to voluntarily dismiss the Secretary of State and the Office of the Secretary of State, and the motion appears to have merit. Accordingly, **IT IS FURTHER ORDERED** that Justice's Johnson's Motion for Volun-

---

**72.** *See* R. Doc. 208.

**73.** *See Statewide Elected Officials,* LOUISIANA.GOV, http://louisiana.gov/Government/Executive_Branch/#electedofficials (last visited Aug. 23, 2012).

tary Dismissal be and hereby is **GRANT-ED,** and Tom Schedler, in his capacity as Secretary of the State of Louisiana, and the Office of the Secretary of State are **DISMISSED** as defendants in this matter.